SCS COMMUNICATIONS, INC. and Stephen C. Swid, Appellants–Cross–Appellees,

v.

THE HERRICK COMPANY, INC. and Norton Herrick, Appellees–Cross–Appellants.

Docket Nos. 02–7362(L), 02–7364(XAP).

United States Court of Appeals, Second Circuit.

Argued: March 5, 2003.

Decided: March 3, 2004.

Gregory P. Joseph, Gregory P. Joseph Law Offices LLC, New York, New York, for Appellant–Cross–Appellee Stephen C. Swid.

David Spears, Richards Spears Kibbe & Orbe, New York, New York, for Appellant–Cross–Appellee SCS Communications, Inc.

Gerald Walpin, Katten Muchin Zavis Rosenman, New York, New York, (Joseph Zuckerman, of counsel), for Appellees–Cross–Appellants The Herrick Company, Inc. and Norton Herrick.

Before: JACOBS, POOLER, Circuit Judges, and HALL, Judge.*

JACOBS, Circuit Judge.

This appeal arises from an arrangement gone awry between two groups for their joint acquisition of a company that was on the block. SCS Communications, Inc. and its principal Stephen C. Swid[1] appeal from

---

* The Honorable Janet C. Hall of the United States District Court for the District of Connecticut, sitting by designation.

1. In this opinion, "SCS" will refer to either SCS Communications, Inc. alone or to SCS Communication, Inc. and Stephen C. Swid combined. "Swid" will refer only to Stephen C. Swid.

the March 28, 2002 amended judgment entered (following a jury verdict) in the United States District Court for the Southern District of New York (Patterson, *J.*), awarding compensatory damages to The Herrick Company, Inc. and its principal Norton Herrick (collectively "Herrick") for breach of contract and breach of fiduciary duty under New York law. SCS attacks the judgment on the grounds that: (1) the district court's dismissal of a nondiverse party failed to cure the jurisdictional defect that occasioned the vacatur and remand; (2) the district court erred in deciding on summary judgment that a binding contract existed among Herrick, SCS, and others; (3) the evidence does not support the jury's findings that Swid is personally liable as a knowing participant in a breach of fiduciary duty and as SCS's alter ego; (4) the jury instructions on damages were erroneous; and (5) the admission into evidence of an unauthenticated handwritten note was reversible error.

Herrick cross-appeals from the judgment insofar as the district court granted a setoff against the jury award for sums paid in settlement by other defendants. An earlier judgment was vacated in an earlier appeal contesting the existence of diversity jurisdiction. *Herrick Co. v. SCS Communications, Inc.*, 251 F.3d 315, 319 (2d Cir. 2001) (*"Herrick I"*).

We conclude that the district court cured the jurisdictional defect by dismissing the nondiverse party after considering the relevant factors. We affirm on the appeal because SCS's substantive arguments are either without merit or waived. On the cross-appeal, we reverse the grant of SCS's post-verdict motion to amend its answer to assert setoff.

## BACKGROUND

A. *The Orleander Transaction*

The following facts are either undisputed or, where touching on issues decided by the jury, viewed in the light most favorable to Herrick. *See Nadel v. Isaksson,* 321 F.3d 266, 272 (2d Cir.2003). In 1993, a number of efforts were mounted to acquire the Orleander Group ("Orleander"), a manufacturer of bicycle accessories. First, Richard Sheinberg and Henry Chan (his associate) attempted an acquisition by a company they formed for that purpose, TOG Acquisition Co. ("TOG"); but failed for lack of financing. Later that year, on August 2, the owners of Orleander granted to Herrick an exclusive right to negotiate for the sale of the business. Shortly thereafter, Herrick approached Sheinberg and Stephen Weinroth (a director of SCS) to discuss a joint acquisition effort.

On August 16, 1993, a letter was executed by Herrick, SCS (by Weinroth), and TOG (by Sheinberg), in which they undertook "to work together to acquire the business of the Orleander Group," and set certain terms for the conduct of the venture (the "Letter Agreement"). The Letter Agreement concluded: "The parties agree that neither they nor any of their affiliates [n]or any other entity in which they own an interest ... will acquire The Orleander Group without complying with the terms of this letter." Shortly after signing the Letter Agreement, the signatories enlisted the services of Skadden, Arps, Slate, Meager & Flom ("Skadden") and Skadden partner, Mark Smith.

Herrick contends (and the district court agreed on summary judgment) that the Letter Agreement is a legally binding contract establishing a joint venture to pursue the purchase of Orleander.

On November 19, 1993, after failed efforts to agree on the structure of the acquisition vehicle and the allocation of rights in the company post-purchase, Sheinberg and Weinroth told Herrick that

he was out of the venture. On November 29, Orleander was acquired by SCS, Swid (the majority stockholder of SCS), and TOG—without Herrick. After Herrick's ejection, the Skadden firm continued to advise SCS and TOG in respect of the acquisition.

Herrick brought suit against SCS, Swid, Weinroth, Sheinberg, Chan, and Vetta Sports, Inc. (as successor to TOG) (collectively, the "business defendants"), alleging breach of contract, breach of fiduciary duty, fraudulent inducement, and knowing participation in a breach of fiduciary duties. Skadden and Smith were also named as defendants for allegedly breaching their fiduciary duties. Herrick sought compensatory and punitive damages from all defendants.

B. *The District Court Proceedings*

The business defendants moved for summary judgment on the ground that the Letter Agreement was unenforceable, and Herrick cross-moved on the ground that the business defendants breached an enforceable joint-venture contract. The court ruled as a matter of law that the Letter Agreement was a valid and enforceable contract establishing a joint venture among its signatories, but identified genuine issues of material fact as to breach and damages.

Trial opened on January 13, 1999 with two days of opening statements. On January 15, Norton Herrick began his direct testimony. The next day, a settlement was reached with defendants Sheinberg, Weinroth, Chan, Skadden, and Smith.

Herrick pressed its case to verdict against SCS and Swid. The judge instructed the jury that the absence of certain defendants and claims "has no significance whatsoever for your consideration of the plaintiff[s'] case against SCS Communications and Stephen Swid."

A special verdict form posed six yes-or-no questions on liability, followed by a final question on damages: "If you answered YES to any of the above questions, what damages do you find plaintiff suffered?" The form did not ask whether any of the settling defendants caused or contributed to Herrick's loss. The jury found SCS liable to Herrick for breach of contract and breach of fiduciary duty, and found Swid personally liable as SCS's alter ego and for his own knowing participation in a breach of fiduciary duty. Herrick was awarded over $10.5 million. Post-verdict motions ensued.

SCS argued post-verdict that Skadden's presence defeated diversity jurisdiction and that Skadden remained a defendant notwithstanding the settlement because no dismissal had yet been entered and because the district court retained jurisdiction over the settlement. The district court rejected the jurisdictional challenge on the grounds that, even assuming complete diversity was lacking at the outset, Skadden was no longer a "party" after the settlement within the meaning of the diversity jurisdiction statute, 28 U.S.C. § 1332(a), and that upholding SCS's challenge would waste judicial resources. That ruling was the chief focus of the first appeal.

SCS and Swid also moved post-verdict for judgment as a matter of law or for a new trial. The denial of those motions is challenged on the present appeal.

The district court granted, however, SCS's post-verdict motion to amend the answer to assert a setoff for sums paid by the settling defendants. The court determined that the setoff was proper under New York General Obligations Law § 15–108(a), implicitly rejecting Herrick's contention that it was prejudiced by SCS's failure to assert the defense earlier.

On August 12, 1999, the district court entered an (amended) judgment in favor of Herrick in the amount of over $8.7 million, a sum derived by the court subtracting from the original award of over $10.5 million (plus prejudgment interest) a setoff of $7.25 million (a figure which represented the present value of Herrick's settlement with the settling defendants).

Both Herrick and SCS appealed from that judgment.

### C. The First Appeal

*Herrick I* focused on jurisdiction. We ruled that "if Skadden has among its partners any U.S. citizens who are domiciled abroad, then Skadden and Herrick (which is a citizen of Florida) are non-diverse," *Herrick I,* 251 F.3d at 322; that the burden of establishing jurisdiction was on Herrick, *id.* at 322–24; and that Herrick's only evidence in support of Skadden's diverse citizenship—Skadden's pretrial admission that diversity jurisdiction existed—was insufficient, *id.* at 324.[2]

We acknowledged that a defect in jurisdiction may be curable by *nunc pro tunc* dismissal of dispensable jurisdictional spoilers, pursuant to Fed.R.Civ.P. 21, and we concluded, under *Newman–Green, Inc. v. Alfonzo–Larrain,* 490 U.S. 826, 109 S.Ct. 2218, 104 L.Ed.2d 893 (1989), that appellate courts have power (to be used "conservatively") to cure a jurisdictional defect in that way. *Herrick I,* 251 F.3d at 330–31. At the same time, we recognized that *Newman–Green* mandates consideration of prejudice, and cautions that remand "might be appropriate" to decide factual disputes bearing on that issue. *Id.* at 331 (quoting *Newman–Green,* 490 U.S. at 838, 109 S.Ct. 2218).

Accordingly, we vacated the judgment, remanded, and directed the district court to decide whether Skadden's presence defeats diversity, and if so, "whether SCS/Swid was unduly prejudiced by Skadden's participation in the lawsuit and consequently whether jurisdiction over the main case may be salvaged, under *Newman–Green,* by eliminating the court's previously asserted jurisdiction over the settlement involving Skadden." *Id.* at 334. We pointed out that, under *Newman–Green,* "if the presence of the nondiverse party" may afford another party a "tactical advantage," *id.* at 331 (quoting *Newman–Green,* 490 U.S. at 838, 109 S.Ct. 2218), then "a jurisdictional defect that might have produced the advantage cannot properly be cured *on appeal* .... It is usually best in such cases to let the district court weigh the advantage—if any—that exists, the prejudice—if any—that advantage causes, and also the existence of countervailing factors, before deciding—in the first instance—on the propriety of curing, *ex post,* the jurisdictional defect." *Id.* at 331–32.

### D. The Remand

On remand, the district court determined that (1) Herrick could not establish that Skadden was a diverse party at the outset of the lawsuit; (2) Skadden is a dispensable party; and (3) dismissing Skadden from the lawsuit pursuant to Rule 21 is not unjust because Skadden's presence caused SCS no prejudice. Only the final determination is an issue on this appeal.

Preliminarily, the district court ruled that Herrick had the burden of showing by a preponderance both tactical advantage and lack of undue prejudice.

---

**2.** We also rejected Herrick's argument that, even if Skadden was nondiverse, jurisdiction over the settlement (to which Skadden was a party) could be isolated from the SCS portion of the lawsuit. *Herrick I,* 251 F.3d at 326–28.

Tracking our language in *Herrick I*, the district court then considered "whether Skadden's presence 'produced a tactical advantage for one party or another.'" The court observed that tactical advantage could occur "where the presence of a non-diverse party allows one side to introduce evidence that would otherwise be inadmissible or access materials that would otherwise have been unobtainable," or "where the nature of the non-diverse party bolsters the credibility of one side"; but the court found that neither concern was raised in the present case.

As to prejudice, SCS argued that Skadden's settlement on the fourth day of trial would have been seen by the jury as an "obvious defeat" for defendants and lent credence to Herrick's claims that "Skadden was acting as SCS/Swid's agent" in the alleged wrongdoing. The court concluded that the alleged prejudice was speculative, ill-founded, and in any event forestalled by the precautionary jury instruction. The court also concluded that Skadden's presence in fact assisted SCS's litigation strategy, which actively relied on Skadden's prestige to argue that Herrick's exclusion from the transaction was effected pursuant to that firm's sound legal advice.

The district court (1) vacated its previous order asserting supplemental jurisdiction over the settlement involving Skadden, (2) dismissed Skadden as a party *nunc pro tunc* as of the date the action was commenced, and (3) reinstated its prior judgment. This appeal followed.

## DISCUSSION

### I

■ SCS invites us to revisit *Herrick I* and conclude that though an appellate court can salvage diversity jurisdiction post-judgment by jettison of the non-di-verse party (or remand for that purpose), an appellate may do so only where (as in *Newman–Green*) the judgment rests on the grant of summary judgment. Although "the law of the case doctrine does not deprive an appellate court of discretion to reconsider its own prior rulings, even when the ruling constituted a final decision in a previous appeal," *Rezzonico v. H & R Block, Inc.*, 182 F.3d 144, 149 (2d Cir. 1999), "we do not revisit such a final decision absent cogent or compelling reasons," *id.* (internal quotation marks and citation omitted). No such reasons are presented here.

True, *Newman–Green* was a summary judgment case, and the opinion notes that, when summary judgment has been granted, dismissal solely because a jurisdictional spoiler is present would result in wheel-spinning: the re-filing of the same case in the same court—without the nondiverse party—with the same preordained result. 490 U.S. at 837, 109 S.Ct. 2218. However, the Court also cited several considerations that are unrelated to summary disposition (such as lack of prejudice and the conservation of time and resources), *id.* at 836–38, 109 S.Ct. 2218, and nowhere confined the cure of jurisdictional defects on appeal to summary judgment cases. Moreover, the power under Rule 21 to dismiss parties was exercised here by the district court.

■ "[I]t is well settled that Rule 21 invests district courts with authority to allow a dispensable nondiverse party to be dropped *at any time, even after judgment has been rendered.*" *Id.* at 832, 109 S.Ct. 2218 (emphasis added); *see also E.R. Squibb & Sons, Inc. v. Lloyd's & Cos.*, 241 F.3d 154, 164 (2d Cir.2001) (affirming the district court's dismissal of jurisdictional spoiler under *Newman–Green* following jury and nonjury trials). This language bespeaks no distinction between types of judgments; indeed, certain of the consid-

erations animating *Newman–Green* may be more compelling after a jury verdict has been rendered. *See* 490 U.S. at 836, 109 S.Ct. 2218 ("[R]equiring dismissal of the [case] after years of litigation would impose unnecessary and wasteful burdens on the parties, judges, and other litigants waiting for judicial attention."); *see also Caterpillar, Inc. v. Lewis,* 519 U.S. 61, 75, 117 S.Ct. 467, 136 L.Ed.2d 437 (1996) ("[After entry of a final judgment], considerations of finality, efficiency, and economy become overwhelming."); *E.R. Squibb & Sons, Inc. v. Accident & Cas. Ins. Co.,* 160 F.3d 925, 938 n. 28 (2d Cir.1998).

■  As to the merits of the analysis, SCS asserts that the proper standard for gauging tactical advantage—which is a key component of measuring prejudice, *see Newman–Green,* 490 U.S. at 838, 109 S.Ct. 2218; *Herrick I,* 251 F.3d at 332—is the *potential* for tactical advantage, and that the district court erred in looking only for *actual* advantage. SCS relies on *Kanzelberger v. Kanzelberger,* 782 F.2d 774 (7th Cir.1986), in which a shareholder of a closely-held corporation joined the non-diverse corporation as co-plaintiff in a suit against the other shareholders, and won a jury verdict. On appeal, the Seventh Circuit declined to salvage the judgment by dismissing the corporation, because "its presence may have colored the outcome of [plaintiff's] suit." *Id.* at 778.

SCS argues from *Kanzelberger* that "Herrick bore the burden of proving that Skadden's presence *could not have colored the outcome before the jury.*" However,

*Kanzelberger,* fairly read, suggests that the corporation's presence was a tactical advantage (for the plaintiff), which in a trial is always a matter of probabilities. In any event, the *Newman–Green* analysis requires consideration of the *prejudice* to the remaining parties; "tactical advantage" is a subset of the prejudice analysis. *See* 490 U.S. at 838, 109 S.Ct. 2218. We turn next to that issue.

■  SCS claims that they were prejudiced at trial (and Herrick advantaged) by Skadden's initial presence and by its exit by way of settlement, i.e., that Skadden's presence allegedly allowed Herrick to paint itself in the transaction as David facing Goliath, and that the settlement was a spurious validation of Herrick's claims against SCS.[3] Rejecting SCS's argument, the district court relied on: "(1) ... the Court's instruction to the jury that it was not to draw any inferences for or against any of the remaining parties by reason of the departures of some of the parties, (2) the speculative nature of SCS/Swid's claim of undue prejudice, (3) the fact that all statements about Skadden could have been introduced via Smith, and (4) the fact that any supposed settlements by Weinroth and Sheinberg, undisputed signatories to the [Letter Agreement], would have been far more damaging to SCS/Swid as an alleged partner than any supposed settlements by Smith and Skadden."

■  As the district court observed, there is little case law on what constitutes a tactical advantage. However, the cases

---

**3.** SCS also contends that though the district court properly assigned to Herrick the burden of proof on the prejudice issue, the district court in fact put the burden on SCS. In support, SCS quotes the district court's conclusion that "SCS/Swid has made no showing that the jury verdict would have been different if Skadden had not been in the case." We agree with Herrick that the quoted language

"is merely the semantic consequence of the framing of the prejudice issue: Herrick was required to prove the non-existence of prejudice, i.e., disprove SCS/Swid's assertions of prejudice. Accordingly, the [district court] had to discuss the absence of arguments and evidence by SCS/Swid to demonstrate how Herrick had satisfied that burden." (emphasis omitted).

suggest that the presence of the nondiverse party must have materially affected the course of the trial proceedings. In *Sweeney v. Westvaco Co.*, 926 F.2d 29, 41–42 (1st Cir.1991), the First Circuit found no tactical advantage because "[e]ven without [the nondiverse defendant's] presence as a party, [plaintiff] could have concluded the same discovery, called [the nondiverse defendant] as a witness, and introduced all the evidence that, in fact, she presented to the jury." In *Casas Office Machines, Inc. v. Mita Copystar America, Inc.*, 42 F.3d 668, 677 (1st Cir.1994), the First Circuit found no tactical advantage where the presence of the nondiverse defendants afforded plaintiffs no access to materials that were otherwise unobtainable. SCS does not undertake to demonstrate that kind of advantage.

The tactical advantage identified in *Kanzelberger* is that joinder of the corporation as a plaintiff in a suit by some shareholders against others "lent some additional credence to [the] claim that the defendants had usurped control of the corporation—made the dispute seem less a squabble among the shareholders and more an effort by the defendants to despoil the corporation." 782 F.2d at 778–79. By analogy to *Kanzelberger*, SCS argues that the presence of a large law firm allied with it cast SCS as a bully and overreacher, and that the apparent settlement by the law firm reinforced the claim against SCS. However, these arguments about prejudice to Herrick resulting from Skadden's presence in the case ignore the fact that Mr. Smith was also a defendant, and that every damaging imputation, appearance, and adversary argument fed by Skadden's presence could have been sustained as well by reference to Smith as a partner in the firm. Mr. Smith exited the trial under the same circumstances but his presence did not defeat diversity and thus remains unchallenged. Thus, the prejudice SCS claims to have suffered as a result of Skadden's presence would have been triggered by Smith's participation in the suit in any case.

■ As to Skadden's exit from the suit via settlement, the district court properly instructed the jury that no inferences are to be drawn against the non-settling parties. Such instructions are regularly given when fewer than all of the parties settle, and there is no reason to upset the presumption that juries follow instructions. *See LNC Invs., Inc. v. Nat'l Westminster Bank*, 308 F.3d 169, 177 n. 10 (2d Cir.2002) ("[W]e must presume the jury to follow its instructions."), *cert. denied*, 538 U.S. 1033, 123 S.Ct. 2080, 155 L.Ed.2d 1063 (2003).

## II

SCS next challenges the district court's ruling, as a matter of law, that the Letter Agreement constituted a binding, enforceable contract. We review the district court's grant of summary judgment *de novo, Young v. County of Fulton*, 160 F.3d 899, 902 (2d Cir.1998), construing the evidence in the light most favorable to the non-moving party and drawing all reasonable inferences in its favor. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Summary judgment is appropriate only where "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c).

We agree with the district court's conclusion that the Letter Agreement is a binding contract to work together in good faith toward a joint acquisition of Orleander and—as a necessary mechanism to enforce such an undertaking—to forgo any acquisition by fewer than all.

A. *Facts*

After Herrick approached Sheinberg and Weinroth about a joint acquisition of Orleander, the parties exchanged several letters on the subject.

An August 13, 1998 letter from Sheinberg to Herrick recited, *inter alia*, that "[t]he proposed partnership discussed above expresses the intentions of the parties hereto," and that the terms of "[a] binding agreement with respect to such partnership shall result only upon the execution of definitive agreements among us." The next day, Herrick sent Sheinberg a revised letter that: omitted these provisions; replaced the term "Approved" by Herrick at the close of the letter with "Accepted"; and stated that TOG and SCS would not acquire Orleander without complying with the terms of the letter.

The Letter Agreement was sent by Sheinberg to Herrick on August 16, and was consistent with the language in Herrick's August 14 draft: (1) "the Parties" (defined as Herrick, SCS, and TOG) would "work together to acquire the business of The Orleander Group"; (2) certain steps would be taken should financing arrangements succeed; and (3) Herrick, SCS, TOG, and their affiliates would refrain from acquiring Orleander without complying with the terms of the letter. The letter was sent and signed by Sheinberg (for TOG) and by Weinroth (for SCS), and was accepted by Herrick (for The Herrick Co.).

By letter dated August 18, 1993, they advised Orleander "that The Herrick Co., Inc., TOG Acquisition Co., and SCS Communications, Inc. have agreed to proceed collectively in the acquisition of the business of the Orleander Group from you."

In September 1993, Skadden and counsel for Orleander began negotiating the terms of an asset purchase agreement;

Sheinberg, Weinroth, and Herrick attended the negotiations or were kept informed by Skadden. Skadden advised Orleander that although the draft documents prepared for the sale refer to the buyer as TOG, "all references to TOG in these agreements as well as in the Asset Purchase Agreement and the Quota Purchase Agreement should be deemed to include TOG, SCS Communications, Inc. and the Herrick Company, Inc."

The Letter Agreement had provided that in the event the signatories were able to arrange for the acquisition and financing of Orleander, they would "form an entity (either a limited partnership or a corporation) to complete the acquisition of The Orleander Group on such terms and conditions." The Letter Agreement had also specified certain features of the new entity: for example, "TOG/SCS and Herrick will be equal owners" and "TOG/SCS and Herrick will be required to provide equal amounts of capital." The signatories "expressly acknowledge[d] that no such entity ha[d] yet been formed nor w[ould] any such entity be formed, until and unless formal written agreements between TOG/SCS and Herrick shall have been entered into establishing such new entity and defining each party's rights and obligations therein which rights and obligations will be consistent with those set forth in this letter."

In October 1993, Herrick formed a shell company and offered it for use as the acquisition vehicle referred to in the Letter Agreement. Instead, the signatories adopted Skadden's suggestion to use TOG as the acquisition vehicle.

On October 7, Herrick paid Skadden $25,000. On October 15, TOG executed an Asset Purchase Agreement and related agreements with the sellers of Orleander. On October 26, a check from Herrick for $50,000 and a check from Sheinberg for

$25,000 were deposited into TOG's checking account and used for acquisition expenses; Weinroth deposited $25,000 in the same account several days later. On November 5 and 10, Skadden sent drafts of a proposed shareholders' agreement to Herrick, Sheinberg, and Weinroth. Herrick retained Michael G. Tannenbaum as counsel to represent Herrick in connection with the negotiation of the shareholders' agreement.

In a November 15 memo, TOG advised Herrick, Sheinberg, and Weinroth that $35,000 needed to be "deposited into TOG immediately." Herrick deposited $17,500 into TOG's checking account three days later. There is no record of any corresponding payment by Sheinberg or Weinroth.

The acquiring group obtained an extension of the closing date from November 17 to December 1, 1993 in exchange for a $500,000 non-refundable deposit to Orleander's sellers. Herrick paid $250,000 toward this deposit.

By letter dated November 19, Sheinberg and Weinroth informed Herrick that unless he sent back a signed copy of an enclosed shareholders' agreement by 5 p.m. the next day, "we will reluctantly conclude that you are unwilling to abide by the terms of our agreement in principle and we will proceed to consummate the acquisition without you."

The following day (according to Herrick), the parties met at Skadden's offices and, by evening, worked out an acceptable shareholders' agreement. Skadden determined, however, that the shareholders' agreement was incompatible with the TOG bylaws, and conformed the bylaws accordingly. Herrick received the revised bylaws that night, and protested that he had relied on the existing bylaws when he agreed to the shareholders' agreement.

On November 21, Sheinberg and Weinroth rejected Herrick's demands and stopped accepting his phone calls. That afternoon, Herrick and some associates went to Skadden's office to see Smith; at Smith's direction, they were escorted out by security. On November 22, Herrick sought a state court injunction against the sale of Orleander, and solicited the sellers of Orleander to close the transaction with him alone. On November 23, Herrick instructed Skadden not to close without Herrick's participation. On November 29, Herrick asked Sheinberg, Weinroth, and Swid (who had stepped into Herrick's place as an investor in TOG) to issue Herrick 50% of TOG's stock, so that closing could occur in accordance with the Letter Agreement. All of these initiatives failed. The Orleander sale was closed without Herrick on November 29.

## B. *Analysis*

The district court determined that the Letter Agreement constituted a binding contract, in part because "the parties considered [the Letter Agreement] to be binding on them." The court examined the parties' conduct before and after the Letter Agreement was signed. Although the August 13 draft of the letter (proposed by Sheinberg) stated that a "binding agreement with respect to such partnership shall result only upon the execution of definitive agreements between us," Herrick demurred, and no such express condition appeared in the Letter Agreement, which instead provided: "The Parties agree that neither they nor any of their affiliates or any other entity in which they own an interest ... will acquire The Orleander Group without complying with the terms of this letter."

For a time after the Letter Agreement was executed, the parties conducted their affairs in accordance with it: they agreed

to acquisition terms, obtained commitments on financing, contributed capital, shared expenses, and exchanged due diligence materials. The business defendants called upon Herrick to provide $317,500, and he complied.

The district court also concluded that the Letter Agreement satisfied the elements necessary to establish a joint venture.

On appeal, SCS contends that (1) the Letter Agreement was an unenforceable agreement-to-agree containing material open terms; (2) alternatively, the obligations contained in the Letter Agreement were subject to express, unfulfilled conditions precedent; (3) no joint venture was established; and (4) the district court erroneously resorted to extrinsic evidence.

■ 1. *Open Terms.* SCS's arguments are premised on a conceptual misunderstanding of the Letter Agreement. Noting the existence of "a series of [material] open terms" concerning the financing, equity, structure, and management of the putative acquisition vehicle, SCS reads the Letter Agreement as a failed stab at an acquisition agreement. However, the district court correctly read the Letter Agreement as a binding agreement that the parties would work together to attempt to acquire Orleander, and would acquire it together or not at all—and as to that there are no open terms. SCS's argument would render meaningless the final provision of the Letter Agreement, which prevents any party from acquiring Orleander without complying with the terms of the Letter.

4. For this reason, we have no need to consider Herrick's argument that, even if these conditions were conditions precedent to the formation of a contract, the conditions were satisfied (or waived) by the parties' selection

■ 2. *Conditions Precedent.* The unfulfilled conditions precedent cited by SCS are that the joint acquisition entity referred to in the Letter Agreement will not be formed until [i] the parties agree on the terms of financing and [ii] execute written formal agreements establishing their rights and obligations in that entity. This argument ignores the difference under New York law between "a condition that must occur before a party's performance under an existing contract becomes due" and "a condition to the formation of the contract itself." *Westerbeke Corp. v. Daihatsu Motor Co.,* 304 F.3d 200, 215 (2d Cir.2002). Nothing in the Letter Agreement expressly provides that the conditions identified by SCS are conditions to the formation of a contract to act jointly in the acquisition of Orleander or not at all.[4] *See Oppenheimer & Co. v. Oppenheim, Appel, Dixon & Co.,* 86 N.Y.2d 685, 687, 636 N.Y.S.2d 734, 660 N.E.2d 415 (1995) (finding that a letter agreement contained an express condition precedent to contract formation where the agreement provided that the contract would be "null and void" unless the condition was fulfilled).

■ 3. *Joint Venture.* Under New York law, a joint venture is formed when (a) two or more persons enter into an agreement to carry on a venture for profit; (b) the agreement evinces their intent to be joint venturers; (c) each contributes property, financing, skill, knowledge, or effort; (d) each has some degree of joint control over the venture; and (e) provision is made for the sharing of both profits and losses. *Itel Containers Int'l Corp. v. Atlanttrafik Express Serv., Ltd.,* 909 F.2d 698, 701 (2d Cir.1990).

of TOG as the acquisition vehicle and by the parties' apparent agreement that TOG's by-laws were acceptable substitutes for the "formal written agreements" called for in the Letter Agreement.

■ SCS's argument that there was no joint venture fatally relies on its view that there was no agreement in the first place. For the reasons above, the Letter Agreement is an agreement to carry on a venture for profit. The intent to be joint venturers is sufficiently expressed in the contractual undertaking "to work together to acquire the business of" Orleander. The Letter Agreement provides that the parties would contribute "equal amounts of capital to the acquisition entity." The requisite degree of joint control is located in the contract requirement that all acquisition and financing terms would require approval by each party. The anticipated equal ownership of Orleander contemplates the sharing of profits and losses.

■ 4. *Extrinsic Evidence.* SCS asserts that the district court erroneously relied on extrinsic evidence to determine (1) whether the parties intended to be bound, and (2) whether the parties contemplated that a shareholders' agreement was necessary to close the transaction. SCS also argues that to resort to extrinsic evidence necessarily implies a finding of ambiguity on those issues that precluded summary judgment. We see no ambiguity. The court consulted extrinsic evidence—which showed that the parties conformed their business relations to the contract terms—in order to confirm that the Letter Agreement was binding. Moreover, even assuming the Letter Agreement was ambiguous as to intent, summary judgment is still proper when "the extrinsic evidence is so one-sided that no reasonable factfinder could decide contrary to one party's interpretation." *Collins v. Harrison–Bode,* 303 F.3d 429, 434 (2d Cir.2002) (quotation marks omitted). The Letter Agreement unambiguously provided that the parties would acquire Orleander together or not at all, and their conduct thereafter demonstrated and confirmed their intent to be so bound. The district court did not err in granting summary judgment to Herrick.

## III

Swid was held personally liable for the breach of the Letter Agreement on two theories: as the alter ego of SCS, and as a knowing participant in a breach of fiduciary duty.

Swid contended in a Rule 50 motion that there was no evidence at trial to sustain the jury's finding that he was the alter ego of SCS and therefore liable for SCS's breach of the Letter Agreement and for SCS's failure to perform its duties under the Letter Agreement. The district court denied the motion, holding that there was sufficient evidence of Swid's domination of SCS—at least with respect to the transaction at issue—for a reasonable jury to find for Herrick. Because we conclude that Swid is personally liable as a knowing participant in a breach of fiduciary duty, we need not consider whether the evidence supported a finding of alter ego.

■ We review *de novo* the district court's denial of Swid's Rule 50 motion for judgment as a matter of law on the knowing participation verdict, and we view the evidence in the light most favorable to Herrick, the nonmovant. *See Wolf v. Yamin,* 295 F.3d 303, 308 (2d Cir.2002).

■ The elements of a cause of action for participation in a breach of fiduciary duty are: breach by a fiduciary of a duty owed to plaintiff; defendant's knowing participation in the breach; and damages. *Diduck v. Kaszycki & Sons Contractors, Inc.,* 974 F.2d 270, 281–82 (2d Cir.1992). Swid's only contention is that Herrick adduced no evidence of Swid's knowledge that the Letter Agreement created fiduciary duties.

The district court instructed the jury that, for Herrick to prevail, it "must be established ... that [Swid] *knew that the co-venturers had fiduciary obligations to plaintiffs,* that one or more of the co-venturers was breaching ... these fiduciary obligations, and that Mr. Swid participated in it and knowingly accepted the benefit of such breach." (emphasis added).

■ The evidence was sufficient to support the element of knowledge: Swid, a sophisticated businessman active in many partnerships, knew of Herrick's relationship with the co-venturers, was aware of the Letter Agreement's terms, caused the breach by closing the Orleander acquisition without Herrick, and accepted the benefit of that breach after Herrick notified Swid that these actions would violate the Letter Agreement.

**IV**

■ SCS argues that the district court erroneously instructed the jury that Herrick could recover as damages either 45% or 100% of the value of Orleander, depending on the legal theory used. We conclude that SCS has failed to preserve this argument for appeal because it failed to object to the instruction at the charging conference, after the jury charge, or as part of the post-trial motions. True, SCS argued to the district court that "there is simply no basis for instructing the jury that [Herrick] is entitled to 100 percent"; however, this argument was advanced immediately preceding the testimony of Herrick's valuation expert, and was directed to a preliminary damage instruction, not to the damages instruction ultimately given the jury.

Under Fed.R.Civ.P. 51, "[a] party who fails to object to a jury instruction at trial waives the right to make that instruction the basis for an appeal." *Fogarty v. Near N. Ins. Brokerage, Inc.,* 162 F.3d 74, 79 (2d Cir.1998). "Where, as here, the party

fails to object to the instruction before the jury begins deliberations, a subsequent challenge based on that charge should be entertained only if the alleged errors are fundamental." *Shade ex rel. Velez–Shade v. Hous. Auth. of New Haven,* 251 F.3d 307, 312 (2d Cir.2001) (quotation marks omitted). "Fundamental error is a more exacting standard than the 'plain error' standard in the criminal context and must be 'so serious and flagrant that it goes to the very integrity of the trial.'" *Fashion Boutique of Short Hills, Inc. v. Fendi USA, Inc.,* 314 F.3d 48, 61 (2d Cir.2002) (quoting *Shade,* 251 F.3d at 312). We have found fundamental error where the jury instructions were "hopelessly confusing and ... fail[ed] to provide even the barest legal guideposts to aid the jury in rationally reaching a decision." *Frederic P. Wiedersum Assocs. v. Nat'l Homes Constr. Corp.,* 540 F.2d 62, 66 (2d Cir. 1976) (quotation marks omitted). "Moreover, a jury verdict will be reversed only when an appellant can show that the instructions as a whole prejudiced it." *Medforms, Inc. v. Healthcare Mgmt. Solutions, Inc.,* 290 F.3d 98, 115 (2d Cir.2002) (quotation marks and alterations omitted).

■ No fundamental error appears here. First, the instructions were sufficiently clear to aid the jury in making a rational decision. *See Frederic P. Wiedersum,* 540 F.2d at 66. Second, any error in giving the "100% instruction" does not call into question the integrity of the trial because the jury verdict is compatible with the "45% instruction," which is unchallenged. *Cf. Atlantic & Gulf Stevedores, Inc. v. Ellerman Lines, Inc.,* 369 U.S. 355, 364, 82 S.Ct. 780, 7 L.Ed.2d 798 (1962) ("Where there is a view of the case that makes the jury's answers to special interrogatories consistent, they must be resolved that way."). Herrick's valuation witness testified that the equity value of

Orleander at the time of acquisition, less the equity paid, was approximately $27.5 million. If the jury credited this testimony, and strictly applied the 45% instruction, an award of $12 .375 million would have resulted. The actual award of $10.5 million is not inconsistent with this calculation, and the difference in amounts can be attributed to the judge's instruction that the jury could find a reduced value of Orleander under SCS's theory that the sellers of Orleander made several material misrepresentations to the purchasing group.

## V

The district court denied SCS's motion for a new trial based on the admission into evidence, over the objection of SCS, of an unauthenticated handwritten note contained in a notebook belonging to Sheinberg. On a page of notes, admittedly written by Sheinberg, is an 18–word sentence written in a different hand: "The more you [underlined four times] say, the more you will get hurt on cross unless it is our party line." Herrick's theory was that someone (perhaps a lawyer) wrote this note to Sheinberg during Sheinberg's 1995 deposition. After the single page was admitted into evidence, Herrick's counsel used the passage in his cross-examination of Sheinberg to suggest that a story had been created for the business defendants and that they were sticking to it. In summation, Herrick's counsel referred to this document and systematically cast defendants' evidence in terms of how it fit into the "party line," observing that "the need to keep to a party line in any testimony demonstrates the opposite of telling the truth under oath." The jury requested the page of notes during its deliberations.

The denial of a motion for a new trial under Rule 59 is reviewed for abuse of discretion. *Baker v. Dorfman*, 239 F.3d

415, 422 (2d Cir.2000). In addition, a "trial court has broad discretion to determine whether a piece of evidence has been properly authenticated and its ruling will not be reversed absent an abuse of discretion." *United States v. Tropeano*, 252 F.3d 653, 661 (2d Cir.2001). "The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." Fed.R.Evid. 901(a). Authentication under this rule "does not erect a particularly high hurdle . . . . The requirement under Rule 901 is satisfied if sufficient proof has been introduced so that a reasonable juror could find in favor of authenticity or identification." *United States v. Dhinsa*, 243 F.3d 635, 658 (2d Cir.2001), *cert. denied*, 534 U.S. 897, 122 S.Ct. 219, 151 L.Ed.2d 156 (internal quotation marks and citations omitted).

The district court ruled that there was sufficient evidence for a reasonable juror to conclude that Sheinberg, or someone known to him, wrote the "party line" statement. This evidence included Sheinberg's admissions that: he owned the notebook; he brought the notebook to his deposition in this lawsuit; the notebook was full of Sheinberg's handwriting from the year he was deposed; and he wrote the five lines that immediately preceding the "party line" notation.

Despite Sheinberg's professed ignorance as to how the notation found its way into his notebook, the district court did not abuse its discretion in admitting the note or in denying SCS's motion for a new trial on that ground. A reasonable juror could have found, *inter alia*, that the "party line" note was written to Sheinberg to remind him not to stray from a scenario created by the defendants. SCS was free to challenge the reliability of the note, to minimize its importance, and to offer alterna-

tive understandings of its meaning; but these and other challenges "go to the weight to be given to the [evidence] by the jury, not to [its] admissibility." *Tropeano,* 252 F.3d at 661. Even if it had been an abuse of discretion to admit the note, we cannot say that a new trial would be required; Herrick offered fairly overwhelming evidence to support his claims.

## VI

▮ After the jury returned a verdict in favor of Herrick of over $10.5 million (plus prejudgment interest), SCS moved to amend its answer to add the affirmative defense of setoff under New York General Obligations Law § 15–108(a) and moved pursuant to Rule 59 to offset the judgment by the full amount paid in the mid-trial settlement. The district court granted both motions, and set off the judgment by the settlement amount, which the court calculated to be (approximately) $7.25 million at present value. Herrick cross-appeals from the judgment insofar as it imposes a setoff.

Herrick argues, as it did to the district court, that the setoff statute is inapplicable because (1) it applies only to tort cases, and (2) the settling defendants and SCS are liable for different injuries. We do not determine whether setoff is available in a case such as this; instead we hold that the district court erred in permitting SCS to amend its answer after the jury returned its verdict without regard to Herrick's prejudice.

▮ "It is settled that the grant of leave to amend the pleadings pursuant to Rule 15(a) is within the discretion of the trial court." *Zenith Radio Corp. v. Hazeltine Research, Inc.,* 401 U.S. 321, 330, 91 S.Ct. 795, 28 L.Ed.2d 77 (1971). However,

under Fed.R.Civ.P. 15(a), leave to amend a pleading may *only* be given when factors such as undue delay or undue prejudice to the opposing party are absent. *Foman v. Davis,* 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962). The district court is in the best position to decide whether an amendment will inflict prejudice in the context of the trial dynamics and the full record; here, however, the court apparently granted SCS's motion without considering whether any of the prejudicial factors outlined in *Foman* were present. *Cf. id.* at 182, 83 S.Ct. 227 ("[O]utright refusal to grant the leave without any justifying reason appearing for the denial is not an exercise of discretion; it is merely abuse of that discretion and inconsistent with the spirit of the Federal Rules.").

Herrick argued in the district court and argues on appeal that SCS's post-verdict amendment deprived Herrick of opportunities to develop a responsive trial strategy, to request different or more refined instructions, or to seek more specific questions as to damages in the special verdict form. Key to this assertion of prejudice is Herrick's contention that the damages awarded by the jury are not co-extensive with the damages paid by the settling defendants because the jury award against SCS had already discounted the liability of the settling defendants and simply represented the damages occasioned by SCS's breaches alone, and because, in any event, some or all of the settlement proceeds were in respect of damages other than the lost opportunity to acquire Orleander. In support of this argument, Herrick chiefly relies on the special verdict form, which posed six questions [5] about the liability of SCS or Swid before asking about damages: "If you answered YES to any of the above questions, what damages do you find plain-

---

**5.** The verdict form asked:
    1. Is SCS liable to plaintiffs for breaching the August 16, 1993 Agreement?

    2. Do you find that Mr. Swid is liable to plaintiffs for breach of the August 16, 1993

tiff suffered?" Since the first six questions referred only to SCS or Swid, the final question relating to damages could have been understood by the jury to refer only to those damages caused by those defendants. A jury following these directions presumably would have already apportioned the damages between the settling defendants and SCS.

The damages award returned by the jury is compatible with such an apportionment theory. Herrick's expert testified that the equity value of Orleander at the time of acquisition, less the equity paid, was approximately $27.5 million. If the jury awarded damages based on 100% of Orleander's value, then the actual award of $10.5 million is within the ballpark of SCS's and Swid's relative culpability; even if the jury consulted the 45% instruction, the apportionment theory is sustainable. Thus Herrick's theory of damages could have withstood the claim of setoff if Herrick had not been blindsided by the post-verdict amendment.

When reviewing for abuse of discretion, "it is rare for an appellate court to disturb a district court's discretionary decision to allow amendment." *Rachman Bag Co. v. Liberty Mut. Ins. Co.*, 46 F.3d 230, 235 (2d Cir.1995). But here it is insufficiently clear that the district judge considered whether the jury award represented Herrick's total and unapportioned damages and whether the post-verdict amendment would prejudice Herrick. Moreover, it would be pointless to ask the district court to decide on a remand whether Herrick was prejudiced by the amended answer

since, at this juncture, the district court is in no better position than this Court to determine how the jury calculated its damages award. In the circumstances, we reverse the district court's grant of SCS's motion to amend its answer under Rule 15.

## CONCLUSION

We affirm the judgment as to liability; as to damages, we reverse the judgment insofar as it imposes a setoff and we remand for entry of judgment in the full amount found by the jury. We remand for any further proceedings as to interest or costs.

Agreement because he was the alter ego of SCS?
3. Is SCS liable to plaintiffs because an affiliate of SCS acquired an interest in Orleander in violation of the August 16, 1993 Agreement?
4. Is SCS liable to plaintiffs for failing to perform its fiduciary duties?

5. Do you find that Mr. Swid is liable to plaintiffs for SCS's failure to perform its fiduciary duties under the August 16, 1993 Agreement because he was the alter ego of SCS?
6. Is Mr. Swid liable to plaintiffs for knowingly participating in a breach of fiduciary duty by a party to the August 16, 1993 Agreement?