Domingo COLON and Luz
A. Colon, Plaintiffs,

v.

MULTI–PAK CORPORATION,
Defendant.

No. 05 Civ. 3630(RWS).

United States District Court,
S.D. New York.

March 7, 2007.

Sanocki Newman & Turret, LLP, New York, NY by: David B. Turret, for Plaintiffs.

Steven R. Sundheim & Associates, LLC, White Plains, NY, by: Steven R. Sundheim, for Defendant.

### OPINION

SWEET, District Judge.

The defendant, Multi–Pak Corporation ("Multi") has moved pursuant to Rule 56 of the Federal Rules of Civil Procedure for summary judgment dismissing the complaint of plaintiffs, Domingo Colon ("Colon") and Luz A. Colon (collectively, the "Colons"). The complaint alleges that Multi is liable under theories of negligence, strict product liability, and express and implied warranty for personal injuries suffered by Colon while operating a garbage compactor. For the reasons set forth below, the motion is granted in part and denied in part.

### Prior Proceedings

Plaintiffs filed the complaint in this action in the Supreme Court of the State of New York, County of the Bronx, on March 7, 2005. Defendant removed the action to this Court on April 8, 2005. Discovery proceeded. The instant motion was filed on July 14, 2006, and marked fully submitted on October 11, 2006.

### The Parties

Multi–Pak Corporation ("Multi") is a New Jersey corporation with its principal place of business at 180 Atlantic Avenue, Hackensack, New Jersey. Multi is in the business of manufacturing garbage compactors for high-rise buildings, and also provides service and maintenance for such machines. Philip J. Cahill ("Cahill") is the president and owner of Multi.

The Colons are husband and wife, and reside at 1668 Vyse Avenue in the Bronx, New York.

### The Facts

The facts were set forth in the Local Rule 56.1 Statement of Facts submitted by Multi ("56.1 Statement"), the Plaintiffs' Response to Local Rule 56.1 Statement of Facts and the Reply to Plaintiffs' Response to Local Rule 56.1 Statement of Facts and are not in dispute except as noted below.

Colon was injured on March 8, 2002, while operating a garbage compactor at 1687 Vyse Avenue in the Bronx, New York (the "Compactor"). Colon was using a broomstick to clear jammed garbage from the Compactor when the hydraulic ram that pushes garbage through the Compactor unexpectedly started up, striking Colon on the left arm and causing multiple fractures of the left radius and ulna.

At the time of the accident, Colon was employed as a porter for PRC Management Company ("PRC"). He had never previously operated the Compactor but had used similar garbage compactors in other buildings managed by PRC. Colon never received any formal training from PRC with respect to garbage compactors; rather, on his first day of work a supervisor quickly told him how to operate a compactor. His entire training in this regard consisted of no longer than five minutes. He was not shown any instruction manuals, nor was he ever told what to do to keep the machines in good working order. No one ever instructed him what to do if garbage became jammed in any of the compactors.

When garbage did get jammed in a compactor, Colon's usual practice was to open the compactor's hopper door and use a stick to push at the garbage in order to clear the jam. The compactors in the buildings managed by PRC were designed to automatically shut off when the hopper door was opened. Each compactor had a spring-loaded mechanism known as an interlock switch; when the hopper door was closed, a button would be depressed and the power would run; when the hopper door was opened, the button would pop up and the power would automatically be shut off. Colon was aware that each compactor also had a manually operated shut-off switch, but because of the automatic shut-off feature he never used this switch, nor was he ever instructed to do so.

Colon ordinarily worked at a building located at 1687 Hoe Avenue. On the morning of the accident, Colon's supervisor Jose Nieves ("Nieves") ordered him to work at 1687 Vyse Avenue for the day to replace a missing porter. Colon described the accident as follows: "I opened the [hopper] door. The machine got shut off as I was pushing [the garbage with the broomstick]. And then the machine suddenly started up with the door open and it got my hand. I was pushing the garbage and the machine started up. Grabbed my hand. The door was open." (56.1 Statement Ex. G, Colon Dep. at 36.)

Plaintiff's expert, Daniel Burdett ("Burdett"), testified that if the interlock switch was working correctly at the time of Colon's accident, the hydraulic ram should not have moved forward while the hopper door was open, because the power should have been shut off.

Defendant's expert, Frank Schwalje ("Schwalje"), inspected the Compactor and took a photograph showing the Compactor's hopper door interlock switch with a piece of wire wrapped around it. Schwalje stated that it seemed to be a mechanism for defeating or attempting to interfere with the operation of the interlock switch. Cahill, the president of Multi, testified that he had heard that compactor operators sometimes disable the interlock switch in order to clear a jam while the compactor is running, to save time.

At his deposition, Colon was shown the photograph of the hopper door interlock switch with a piece of wire on it. He did not remember if the hopper door was in that condition at the time of his accident, and he did not know what purpose the wire served.

Defendant Multi did not design or manufacture the Compactor, nor any part of it. A similarly named entity, Multi–Pak Corp ("MPC") manufactured and sold the Compactor at issue to PRC. According to Cahill, "MPC had no affiliation with Multi whatsoever." (56.1 Statement Ex. J, Cahill Aff. ¶ 5.) MPC subsequently sold its assets to a company named Multi–Pak Sales Corporation ("MPS").

Multi came into existence in 1989, when it purchased all of the assets of MPS pursuant to an Asset Purchase Agreement

(the "Agreement"). Multi acquired from MPS all customer and mailing lists; all rights under purchased contracts; all unfulfilled purchase or sale orders; all inventory, machinery, equipment, furniture, accessories, fixtures, supplies and other tangible equipment or tangible personal property; all intellectual property rights; all accounts receivable and each name, trade name and telephone number as used in business and owned by MPS.

The Agreement provided that Multi would assume all accounts payable "as listed on Schedule 6," all accrued and unpaid expenses "listed on Schedule 7," all liabilities and obligations under the purchased contracts, and "all long term obligations of [MPS] listed on Schedule 8." (56.1 Statement Ex. I, Agreement ¶ 1(b), at 3.) Cahill has stated that the liabilities assumed by Multi did not include liability for products that had been sold by MPC, the predecessor-in-interest to MPS. (56.1 Statement Ex. J, Cahill Aff. ¶ 8.) Cahill has further stated that although paragraph 1(b) of the Agreement refers to "Schedules 6, 7 and/or 8," Multi is not in possession of any such documents, and that he believes no such documents exist (*Id.* ¶ 16); in other words, that the only liabilities assumed by Multi were those arising under the purchased contracts.

According to Multi, there was never any affiliation between Multi and MPS. Prior to the execution of the Agreement, Cahill did not know or have any affiliation with the owner of MPS, James O'Rourke ("O'Rourke"). MPS did not immediately dissolve after execution of the Agreement, but continued to exist until 1994.

After the Agreement was executed, Multi initially continued to manufacture compactors in the product line of MPS, including the Multi–Pak 8A, the model type of the Compactor at issue. As Multi did not acquire any engineering plans for compactors from MPS, it retained a number of former MPS employees and relied on them in the manufacturing process. After a few years, Multi began manufacturing compactors on its own designs, which included changes to the interlock switch, the length of the hydraulic ram, the manufacture of the hydraulic cylinder and the type of steel used in the compactors.

MPS did not give Multi a list of garbage compactors that were previously sold, nor did Multi have the serial numbers of such machines previously sold. According to Multi, its only involvement with PRC aside from a recent price inquiry was the performance of service on some of PRC's garbage compactors approximately ten years ago. Cahill has testified that such service did not include the Compactor at issue, but no documentation has been produced in support of this statement. Nieves, Colon's supervisor at PRC, has testified that prior to Colon's injury Multi–Pak serviced compactors owned by PRC, and that he thought that Multi–Pak had a service contract with PRC at some point.

Cahill testified that his Service Department had reported to him that the interlock switches on Multi–Pak compactor hopper doors had been defeated by customers. He testified that when one of his technicians serviced a compactor and observed that a switch had been disabled, the technician would put a sticker on the machine warning compactor operators not to modify the switch.

Prior to being served with the Summons and Complaint in this action, Multi had no knowledge of any complaints regarding the Compactor at issue, and Multi never received any such complaints.

### The Summary Judgment Standard

Pursuant to Rule 56, summary judgment may be granted only if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *See* Fed.R.Civ.P. 56(c); *Celotex Corp. v.*

*Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *SCS Communications, Inc. v. Herrick Co.,* 360 F.3d 329, 338 (2d Cir.2004). The court will not try issues of fact on a motion for summary judgment, but rather, will determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 251–52, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

Summary judgment is appropriate where the moving party has shown that "little or no evidence may be found in support of the nonmoving party's case. When no rational jury could find in favor of the nonmoving party because the evidence to support its case is so slight, there is no genuine issue of material fact and a grant of summary judgment is proper." *Gallo v. Prudential Residential Servs., Ltd. P'ship,* 22 F.3d 1219, 1223–24 (2d Cir.1994) (internal citations omitted). The moving party has the burden of showing that there are no material facts in dispute, and the court must resolve all ambiguities and draw all reasonable inferences in favor of the party opposing the motion. *Bickhardt v. Ratner,* 871 F.Supp. 613 (S.D.N.Y. 1994) (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)).

**Discussion**

The Complaint alleges four causes of action against Multi, including negligence, strict product liability, and express and implied warranty. According to the Colons, the Compactor was defectively designed in that it could be readily modified to operate without the use of safety features, including the interlock switch; was manufactured unfit for foreseeable uses and incidents including trapped, caught or jammed refuse; and was defective for lack of proper warnings regarding the known

and foreseeable dangers of operation. For the reasons set forth below, summary judgment will be granted for Multi on all claims except Plaintiffs' cause of action alleging negligent failure to warn.

*A. New York Law Governs Plaintiffs' Claims*

A federal court sitting in diversity jurisdiction must determine the governing law "by looking to the choice of law principles of the forum state." *Jackson v. Domtar Indus., Inc.,* 35 F.3d 89, 92 (2d Cir.1994) (citing *Klaxon Co. v. Stentor Elec. Mfg. Co.,* 313 U.S. 487, 496, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941)). In tort actions, New York courts apply an "interest analysis to determine which of two competing jurisdictions has the greater interest in having its law applied in the litigation." *Padula v. Lilarn Props. Corp.,* 84 N.Y.2d 519, 521, 620 N.Y.S.2d 310, 644 N.E.2d 1001 (1994) (discussing *Babcock v. Jackson,* 12 N.Y.2d 473, 240 N.Y.S.2d 743, 191 N.E.2d 279 (1963)). This interest analysis requires two separate inquiries: "(1) what are the significant contacts and in which jurisdiction are they located, and (2) whether the purpose of the law is to regulate conduct or allocate loss." *Id.* Under *Babcock,* conduct-regulating rules such as the duty and standard of care applicable to manufacturers are traditionally supplied by the place where the tort occurred, because that state has "the greatest interest in regulating behavior within its borders." *Id.*

Where, as here, the plaintiffs are New York residents, the accident occurred in New York, the product at issue was sold to the plaintiff's employer in New York, and the defendant manufacturer continues to do business in New York, that state has the greatest interest in regulating the defendant manufacturer's conduct, notwithstanding that the manufactur-

er is incorporated and has its principal place of business in another state. *Cacciola v. Selco Balers, Inc.*, 127 F.Supp.2d 175, 184 (E.D.N.Y.2001). In the case at bar, therefore, the controlling law to be applied is that of New York.

### B. Multi Did Not Succeed to MPC or MPS Liability

■ The facts set forth above establish that Multi did not design, manufacture or sell the Compactor. However, the Colons seek to hold Multi liable under a successor liability theory. In general, under New York law "a corporation which acquires the assets of another is not liable for the torts of its predecessor." *Schumacher v. Richards Shear Co.*, 59 N.Y.2d 239, 244, 464 N.Y.S.2d 437, 451 N.E.2d 195 (1983) (citations omitted). Exceptions to the rule may be made where the acquiring corporation "expressly or impliedly assume[s][its] predecessor's tort liability, there [is] a consolidation or merger of seller and purchaser, the purchasing corporation [is] a mere continuation of the selling corporation, or the transaction is entered into fraudulently to escape such obligations." *Id.* at 245, 464 N.Y.S.2d 437, 451 N.E.2d 195. The general rule and the four acknowledged exceptions apply equally to contract cases. *See Cargo Partner AG v. Albatrans, Inc.*, 352 F.3d 41, 45 (2d Cir.2003).

Plaintiffs have argued that Multi is liable for the alleged torts of its predecessors under the second and third exceptions laid out in *Schumacher*, in that the transaction between Multi and MPS constituted a de facto merger, and that Multi is a mere continuation of MPS and MPC. Under New York law, neither of these exceptions is applicable upon the facts presented.

■ To determine whether a de facto merger has occurred, "New York courts have looked to four traditional common-law factors: whether there is continuity of

ownership, continuity of management, a dissolution of the selling corporation, and the assumption of liabilities by the purchaser." *New York v. Nat'l Serv. Indus.*, 460 F.3d 201, 210 (2d Cir.2006). "It has been held that, because continuity of ownership is 'the essence of a merger,' it is a necessary element of any de facto merger finding . . . ." *In re New York City Asbestos Litig.*, 15 A.D.3d 254, 789 N.Y.S.2d 484, 487 (N.Y.App. Div. 1st Dep't 2005) (citing *Cargo Partner AG*, 352 F.3d at 47). Although the New York Court of Appeals has not explicitly ruled that continuity of ownership is a necessary predicate to a finding of a de facto merger, the Second Circuit has embraced such a rule, based in part on the ruling of the Court of Appeals in *Semenetz v. Sherling & Walden, Inc.*, 7 N.Y.3d 194, 818 N.Y.S.2d 819, 851 N.E.2d 1170 (2006), which rejected the "product line" exception to the traditional successor liability rule:

> Although *Semenetz* concerned a different theory of successor liability, it clearly suggests that the New York Court of Appeals will not eviscerate traditional common-law norms of successor liability in tort cases. That is, it suggests that the court does not find the public policy considerations at issue in tort cases sufficient to justify the departure from the common-law standards that would be necessary to find the existence of a de facto merger in the absence of any evidence of continuing ownership.

*Nat'l Serv. Indus.*, 460 F.3d at 214–15. As no showing has been made of any continuity of ownership between Multi and MPS, let alone between Multi and MPC, the de facto merger exception does not apply.

■ The "mere continuation" exception to the traditional rule applies where "it is not simply the business of the original corporation which continues, but the corporate entity itself." *Ladjevardian*

*v. Laidlaw–Coggeshall, Inc.*, 431 F.Supp. 834, 839 (S.D.N.Y.1977). "A continuation envisions a common identity of directors, stockholders and the existence of only one corporation at the completion of the transfer." *Id.; see also Schumacher*, 59 N.Y.2d at 245, 464 N.Y.S.2d 437, 451 N.E.2d 195 ("The ['mere continuation'] exception refers to corporate reorganization ... where only one corporation survives the transaction; the predecessor corporation must be extinguished."). Plaintiffs have not produced any evidence to support a finding of a common identity of directors or shareholders in the case at bar, nor have they disputed that MPS, the immediate predecessor to Multi, continued to exist as a separate entity for nearly five years after the execution of the Agreement. On the facts presented, Multi cannot be found to be a mere continuation of MPS nor MPC.[1]

■ To the extent that Plaintiffs' papers can be read to suggest a "product line" exception to the traditional rule, this argument is foreclosed by the decision of the Court of Appeals in *Semenetz*, which explicitly rejected the product line exception, noting that:

> extending liability to the corporate successor places responsibility for a defective product on a party that did not put the product into the stream of commerce. This is inconsistent with the basic justification for strict products liability, 'which is to place responsibility for a defective product on the manufacturer who placed that product into commerce. The corporate successor has not created the risk, and only remotely benefits from the product. The successor has not invited usage of the product or implied its safety. Since the successor was never in a position to eliminate the risk, a major purpose of strict liability in

modifying a manufacturer's behavior is also lost.'

7 N.Y.3d at 201, 818 N.Y.S.2d 819, 851 N.E.2d 1170 (quoting *Bernard v. Kee Mfg. Co.*, 409 So.2d 1047, 1050 (Fla.1982)).

Upon these authorities, Multi cannot be held liable as the successor corporation to either MPS or MPC.

**C. Multi May Be Liable for Failure to Warn**

■ Although not liable as a successor corporation, Multi may be liable for its alleged negligence in failing to warn of known dangers or of those dangers which it had reason to know. Such a duty to warn "commonly is imposed because of some special relationship, frequently economic, not only for those bearing special responsibilities such as common carriers and innkeepers, but on defendants generally...." *Schumacher*, 59 N.Y.2d at 246, 464 N.Y.S.2d 437, 451 N.E.2d 195.

> During the last century, liability for "nonfeasance" has been extended still further to a limited group of relations, in which custom, public sentiment, and views of social policy have led the courts to find a duty of affirmative action. It is not likely that this process of extension has ended. For the most part such a duty has been imposed where the relation is of some actual or potential economic advantage to the defendant, and the expected benefit justifies the requirement of special obligations.

Prosser, *Law of Torts* § 56, at 339 (4th ed.1971). Both New York and Federal courts have ruled that successor corporations may have a duty to warn under circumstances similar to those presented here. *See, e.g., Schumacher*, 59 N.Y.2d at

---

**1.** As the Second Circuit has noted, "[s]ome courts have observed that the mere-continuation and de-facto-merger doctrines are so similar that they may be considered a single exception." *Cargo Partner AG*, 352 F.3d at 45, n. 3 (citing cases).

246–49; *Sweatland v. Park Corp.,* 181 A.D.2d 243, 587 N.Y.S.2d 54 (N.Y.App. Div. 4th Dep't 1992); *Leannais v. Cincinnati, Inc.,* 565 F.2d 437, 442–43 (7th Cir. 1977).

In *Schumacher,* the plaintiff was injured while operating a shearing machine sold to his employer by the defendant corporation's predecessor. The Court of Appeals modified an order of the Appellate Division granting summary judgment against the plaintiff on the issue of negligent failure to warn, finding that a duty to warn could arise "because of the relationship between the acquiring corporation and the purchaser of the machinery ... and because of the knowledge which the acquiring corporation possesses or has reason to possess concerning the risk of personal injury created by operation of the machine...." 59 N.Y.2d at 243. The court noted that factors to be considered in determining the existence *vel non* of a duty to warn include "[s]ucession to a predecessor's service contracts, coverage of the particular machine under a service contract, service of that machine by the purchaser corporation, [and] a purchaser corporation's knowledge of defects and of the location or owner of that machine." *Id.* at 247 (quoting *Travis v. Harris Corp.,* 565 F.2d 443, 449 (7th Cir.1977)). The court found questions of material fact as to the existence of the duty where the defendant corporation had serviced the shearing machine approximately ten years before the injury, had contacted the plaintiff's employer to solicit business, and had supplied replacement parts for the machine.

In the instant case, it is undisputed that Multi provided service for PRC compactors with the same interlock switch design as the Compactor at issue, and that there have been subsequent business contacts between Multi and PRC. Plaintiffs have produced evidence that suggests Multi may have held a service contract for compactors owned by PRC. In connection with the facts presented regarding Multi's knowledge of the dangers presented by potential modification of the interlock switch, this evidence is sufficient to raise an issue of material fact as to the existence of a duty to warn.

In addition, the evidence in the record does not permit a determination as a matter of law regarding the adequacy of any warnings provided by Multi or whether the alleged failure to warn was the proximate cause of the injury to Colon. Summary judgment on Plaintiffs' negligent failure to warn claim is therefore foreclosed. *See Johnson v. Johnson Chem. Co.,* 183 A.D.2d 64, 588 N.Y.S.2d 607, 611 (N.Y.App. Div.2d Dep't 1992) ("Whether a particular way of misusing a product is reasonably foreseeable, and whether the warnings which accompany a product are adequate to deter such potential misuse, are ordinarily questions for the jury.")

### Conclusion

For the reasons set forth above, the motion for summary judgment is denied as to Plaintiffs' claim of negligent failure to warn, and granted in all other respects.

It is so ordered.