**BOARD OF TRUSTEES OF THE AFTRA RETIREMENT FUND, in its capacity as a fiduciary of the AFTRA Retirement Fund, individually and on behalf of all others similarly situated, Plaintiff,**

v.

**JPMORGAN CHASE BANK, N.A., Defendant.**

Board of Trustees of the Imperial County Employees' Retirement System, in its capacity as a fiduciary of the Imperial County Employees' Retirement System, individually and on behalf of all others similarly situated, Plaintiff,

v.

JPMorgan Chase Bank, N.A., Defendant.

The Investment Committee of the Manhattan and Bronx Surface Transit Operating Authority Pension Plan, in its capacity as a fiduciary of the MaBSTOA Pension Plan, individually and on behalf of all others similarly situated, Plaintiff,

v.

JPMorgan Chase Bank, N.A., Defendant.

Nos. 09 Civ. 686(SAS), 09 Civ. 3020(SAS), 09 Civ. 4408(SAS).

United States District Court, S.D. New York.

Aug. 4, 2010.

Joseph H. Meltzer, Esq., Peter H. LeVan, Jr., Esq., Barroway Topaz Kessler Meltzer & Check, LLP, Radnor, PA, Bradley E. Beckworth, Esq., Brad Seidel, Esq., Nix Patterson & Roach, LLP, Daingerfield, TX, Milo Silberstein, Esq., Dealy & Silberstein, LLP, New York, NY, David L. Wales, Esq., Bernstein, Litowitz, Berger & Grossman, LLP, New York, NY, Gregory M. Nespole, Esq., Wolf Haldenstein Adler Freeman Herz LLP, New York, NY, for Plaintiffs.

Lewis Richard Clayton, Esq., Jonathan H. Hurwitz, Esq., Paul, Weiss, Rifkind, Wharton & Garrison LLP, New York, NY, for JPMC.

### OPINION AND ORDER

SHIRA A. SCHEINDLIN, District Judge.

## I. INTRODUCTION

Plaintiffs Board of Trustees of the AFTRA Retirement Fund, in its capacity as a fiduciary of the AFTRA Retirement Fund ("AFTRA"), Board of Trustees of the Imperial County Employees' Retirement System, in its capacity as a fiduciary of the Imperial County Employees' Retirement System ("ICERS"), and Investment Commit tee of the Manhattan and Bronx Surface Transit Operating Authority Pension Plan ("MaBSTOA") bring three consolidated putative class actions against JPMorgan Chase Bank, N.A. ("JPMC"). Plaintiffs seek to recover losses they suffered when the structured investment vehicle ("SIV"), Sigma Finance, Inc. ("Sigma"), collapsed on September 30, 2008. Plaintiffs move to certify the following class:

> All plans and entities for which JPMorgan Chase Bank, N.A., pursuant to a securities lending agreement, invested cash collateral, either directly or through a collective investment vehicle, in one or more debt securities of Sigma Finance, Inc. and continued to hold those debt securities as of the close of business on September 30, 2008.[1]

Plaintiffs clarify in their Reply that this class definition is intended to include only those investors who held Sigma Medium–Term Notes that were purchased in June 2007 and had a maturity date of June 2009 ("2009

---

**1.** *See* Plaintiffs' Memorandum in Support of Motion for Class Certification ("Pl.Mem.") at 3.

Sigma MTNs").[2] Plaintiffs also seek an order appointing them as class representatives and approving plaintiffs' selection of Barroway Topaz Kessler Metlzer & Check, LLP ("Barroway Topaz") as class counsel.

JPMC objects to class certification only on a narrow aspect of plaintiffs' motion. According to JPMC, five direct account holders[3]—out of the seventy-six total putative class members[4]—should not be included as class members because they cannot satisfy the predominance or superiority requirements of Rule 23(b) of the Federal Rules of Civil Procedure.[5] Despite their small number, the implications of excluding these five direct account holders are substantial as they collectively suffered approximately eighty percent of the total losses alleged. Having carefully considered the arguments raised by the parties, I conclude that plaintiffs have met their burden to demonstrate each of the Rule 23 requirements by a preponderance of the evidence. The individual issues identified by JPMC do not threaten to overwhelm the class, require this Court to conduct numerous mini-trials, or make the class as a whole unmanageable. Accordingly, the direct account holders are properly included in the class and plaintiffs' motion for class certification is granted.

## II. BACKGROUND

### A. Parties and Claims

Plaintiffs are fiduciaries of three separate retirement plans that entered into securities lending agreements with their custodial bank, JPMC. AFTRA is an Employment Retirement Income Security Act ("ERISA")-governed employee benefit plan. AFTRA asserts for itself and all other class members governed by ERISA two claims for relief under ERISA: (1) breach of the fiduciary duty to prudently and loyally manage plan assets (the "prudence claim"); and (2) breach of the fiduciary duty of loyalty, which encompasses the obligation to avoid conflicts of interest.[6] ICERS and MaBSTOA, each of which is a governmental plan not subject to ERISA, assert for themselves and all other class members not governed by ERISA, three claims for relief that arise under New York law: (1) breach of the fiduciary duty to prudently and loyally manage plan assets (the "prudence claim"); (2) breach of the fiduciary duty of loyalty, which encompasses the obligations to avoid conflicts of interest; and (3) breach of the securities lending agreement with JPMC.[7] ICERS and MaBSTOA also assert negligence claims against JPMC, but they do not seek class certification of those claims at this time.[8]

### B. JPMC's Securities Lending Program

Each plaintiff, as well as each proposed member of the class, participated in JPMC's securities lending program.[9] The stated purpose of the program was to "obtain an attrac-

**2.** *See* Plaintiffs' Reply to Defendant's Memorandum in Opposition to Plaintiffs' Motion for Class Certification ("Pl.Reply") at 18.

**3.** JPMC's expert, Michael Koehn, indicates that there were eight direct account holders at the time of Sigma's September 2008 collapse. *See* Table: Key Characteristics of Security Lending Agreements between JPMorgan Chase Bank

**4.** *See* Stipulation Regarding Plaintiffs' First and Second 30(b)(6) Deposition Notices, Ex. A to the Declaration of Peter H. LeVan, Jr., plaintiffs' counsel, in Support of Plaintiffs' Motion for Class Certification ("LeVan Decl.") ("Stipulation") ¶ II.2. and Potential Class Members, Ex. 3 to Koehn Declaration ("Koehn Decl.") ("Key Characteristics Table"). Because JPMC does not argue that the three additional direct account holders identified by Koehn—assuming *arguendo* his characterization is correct—should be excluded from the class, *see* Defendant's Memorandum in

Opposition to Plaintiffs' Motion for Class Certification ("Def. Opp.") at 14–19, I address only JPMC's concerns relating to the five direct account holders it names. I nevertheless note that even if there were eight direct account holders, the outcome would be the same.

**5.** *See* Def. Opp. at 1.

**6.** *See* Amended Class Action Complaint of AFTRA ("AFTRA Compl.") ¶¶ 91–109.

**7.** *See* Class Action Complaint of ICERS ("ICERS Compl.") ¶¶ 89–99, 108–116; Class Action Complaint of MaBSTOA ("MaBSTOA Compl.") ¶¶ 94–101, 111–119.

**8.** *See* Pl. Mem. at 5 n. 4.

**9.** *See* AFTRA Compl. ¶ 21; ICERS Compl. ¶ 20; MaBSTOA Compl. ¶ 22.

tive return while minimizing risk."[10] JPMC's securities lending participants invested through JPMC's securities lending program in one of two ways: (1) collective investment vehicles; or (2) individually directly-managed accounts. Collective investment vehicles invested participants' funds on a communal basis while direct account holders each owned and controlled a distinct investment portfolio.[11]

Decisions to purchase securities were made on an account-by-account basis by a JPMC securities lending portfolio manager.[12] Such decisions were subject to the account's investment guidelines.[13] Individual participants in collective investment vehicles had no authority to direct the purchase of specific securities or to impose investment restrictions beyond those set forth in each fund's investment guidelines.[14] Direct account holders retained high level authority over their accounts—meaning that they could limit the issuers from which securities could be purchased for their account—but direct account holders could not order any specific purchases.[15] Direct account holders also had full authority to direct JPMC to hold or sell particular securities, tailor their investment guidelines to reflect their risk-return preferences, include or exclude permitted categories of securities, and change their guidelines as the markets or their preferences change.[16]

## C. JPMC's 2009 Sigma MTN Investment

As of June 2007, Sigma was listed on JPMC's "buy list."[17] An issuer's presence on the list meant that JPMC's asset management arm ("JPMAM") had performed due diligence and an independent credit analysis on the issuer and found that it was investment worthy.[18] Even though some direct account holders could provide JPMC with a pre-approved list of issuers, JPMC would only purchase securities from those issuers if they were also on JPMAM's buy list.[19]

That same month, JPMC purchased approximately five hundred million dollars of the 2009 Sigma MTNs on behalf of six accounts.[20] One of the purchases was for a direct account holder that subsequently instructed JPMC to sell its 2009 Sigma MTN holdings and is not part of the putative class;[21] the remaining five held the 2009 Sigma MTNs until Sigma entered receivership on September 30, 2008.[22]

As of June 2007, three of the five accounts were the collective investment vehicles Cash-Co, DSTI, and ConCas.[23] JPMC purchased approximately one hundred million dollars worth of 2009 Sigma MTNs for CashCo, of which AFTRA, ICERS and MaBSTOA, among others, were members.[24] JPMC

---

**10.** AFTRA Compl. ¶21; ICERS Compl. ¶20; MaBSTOA Compl. ¶22.

**11.** *See* Declaration of Matthew B. Sarson, JPMC portfolio manager, ("Sarson Decl.") ¶7.

**12.** *See id.* ¶11; Deposition of Matthew B. Sarson, Ex. B to LeVan Decl., Ex. B to the Declaration of Samuel E. Bonderoff, JPMC's counsel ("Bonderoff Deck"), and Ex. A to the Declaration of Joseph H. Meltzer, plaintiffs' counsel, in Support of Plaintiffs' Reply to Defendant's Memorandum in Opposition to Plaintiffs' Motion for Class Certification ("Meltzer Decl.") ("Sarson Dep.") at 260:24–261:16 (identifying the portfolio managers that managed the class members' accounts).

**13.** *See* Sarson Decl. ¶6.

**14.** *See id.*

**15.** *See* Sarson Dep. at 238:21–239:23.

**16.** *See* Sarson Decl. ¶7; Sarson Dep. at 239:24–240:13.

**17.** *See* Deposition of Adam Brinton, JPMC portfolio manager, Ex. F to Meltzer Decl. ("Brinton Dep.") at 18:2–24.

**18.** *See id.* at 18:2–24; Deposition of David Reddy, JPMC portfolio manager ("Reddy Dep.") at 63:20–24.

**19.** *See* Sarson Dep. at 109:5–11.

**20.** *See* Stipulation ¶2; Sarson Dep. at 199:11–15.

**21.** *See* Sarson Decl. ¶26. When that direct account holder sold its 2009 Sigma MTNs, it reduced JPMC's total 2009 Sigma MTN holdings to $490 million. *See* Sarson Dep. at 199:21–200:23.

**22.** *See* Sarson Decl. ¶13.

**23.** *See id.* ¶6.

**24.** *See id.*

placed approximately sixty-five million dollars worth of 2009 Sigma MTNs with DSTI, of which putative class members—but not named plaintiffs—NYMEX and World Bank, among others, were members.[25] JPMC placed approximately fifty million dollars worth of 2009 Sigma MTNs in ConCas.[26] ConCas was a collective investment vehicle limited to a group of pension plans affiliated with and managed by General Motors Asset Management ("GMAM").[27]

The remaining two allocations of the June 2007 purchase were made to direct account holders New York State Common Retirement Fund ("NYSCRF") and IBM Retirement Fund ("IBM"). Approximately $175 million of 2009 Sigma MTNs was allocated to NYSCRF [28] and approximately one hundred million dollars of the MTNs was allocated to IBM.[29]

In March 2008, GMAM disbanded ConCas and distributed the assets among the ConCas participants.[30] GMAM became a direct account holder at that time.[31] In June 2008,

NYMEX, and World Bank withdrew from DSTI and opened their own direct accounts with JPMC.[32] NYMEX, GMAM, and World Bank held their 2009 Sigma MTNs throughout the class period.[33]

### D. JPMC's Alleged Wrongdoing

When JPMC purchased the 2009 Sigma MTNs in June 2007 the residential mortgage market had already begun to collapse.[34] As early as August 2007, analysts following Sigma and other SIVs warned that the lack of liquidity in the credit market, as well as sharp declines in the market value of assets backing many SIVs, threatened their financial viability.[35] JPMC's securities lending program even halted any new investments in SIVs as of August 2007.[36] More than a dozen SIVs failed between August and October 2007 [37] and JPMC's internal analysts became concerned about whether Sigma would be able to pay par value of the MTNs upon maturity.[38] Nevertheless, JPMC never tried

---

**25.** *See id.* ¶ 25 n. 3.

**26.** *See id.* ¶¶ 10, 22; Sarson Dep. at 259:20–260:13.

**27.** *See* Sarson Decl. ¶ 6 n. 1; Sarson Dep. at 59:13–19.

**28.** *See* Sarson Decl. ¶ 15.

**29.** *See id.*

**30.** *See* Sarson Dep. at 63:13–18.

**31.** *See id.*

**32.** *See* Sarson Decl. ¶ 25 n. 3.

**33.** *See id.* ¶ 25.

**34.** *See* Rebuttal Declaration of Daniel J. Nigro, plaintiffs' expert, Ex. G to Meltzer Decl. ("Nigro Decl.") ¶ 21 (listing nineteen "red flag events impacting the residential mortgage market, and financial markets generally, prior to June 4, 2007").

**35.** *See* AFTRA Compl. ¶¶ 43–69; ICERS Compl. ¶¶ 41–67; MaBSTOA Compl. ¶¶ 45–85.

**36.** *See* Sarson Dep. at 272:3–8.

**37.** *See* AFTRA Compl. ¶ 45; ICERS Compl. ¶ 43; MaBSTOA Compl. ¶ 47.

**38.** *See* 10/4/07 Internal JPMC Email, Ex. D to LeVan Deck, at 5 (stating that "we are still confident senior note holders get paid out at par" with regard to SIVs generally, but noting more specifically that "[Sigma] Sr. management, however, does not seem to acknowledge there is a problem despite the lack of senior funding; from our conversations I do not believe they have sold assets. They continue to pay out the full coupon on their capital notes (which they have the option to suspend or defer). We know they are aggressively using repo [financing] to fund themselves but come October, I expect them to come under more pressure. Developing."); 2/8/08 Internal JPMC Bloomberg Message, Ex. D to LeVan Decl., at 18 ("should I be more nervous about sigma the non-siv? cuz I am .... feel like these guys are running out of options"); 6/5/08 Internal JPMC Email, Ex. I to Bonderoff Deck, at 7 (reporting that the month end May 2008 report showed that "[a]s Sigma continues to dispose of assets ... the portfolio composition has shifted ... away from structured product and towards financials ... with AAA's decreasing to 38% from 51% over the same time period," but noting that "[w]hile Sigma faces significant maturing liabilities in the coming months, thus far they have demonstrated their ability to meet cash needs through the tools available to them (repo, asset sales, ration trades). Based on our analysis of the portfolio, we believe even in a worst case scenario, the intrinsic value of the bond is worth more than a potential sale price of 70 cents on the dollar.").

to sell or recommend the sale of the 2009 Sigma MTNs.[39]

Beginning in February 2008, JPMC—without disclosure to the class members—began providing repurchase financing ("repo financing") to Sigma.[40] In exchange, JPMC collected substantial fees of more than $228 million between February and September 2008 allegedly creating a conflict of interest between JPMC and the securities lending participants.[41]

On September 30, 2008, after Sigma failed to meet one of JPMC's margin calls, JPMC declared Sigma in default of its repo agreements, seized the assets that had been pledged to support the repo facilities, and forced Sigma into receivership proceedings.[42] As a result, JPMC's securities lending participants suffered significant losses.[43]

## III. APPLICABLE LAW

### A. Class Certification

#### 1. Requirements Under Rule 23(a)

Rule 23 of the Federal Rules of Civil Procedure governs class certification. " 'Rule 23 is given liberal rather than restric-

tive construction, and courts are to adopt a standard of flexibility.' "[44] To be certified, a putative class must first meet all four prerequisites set forth in Rule 23(a), commonly referred to as numerosity, commonality, typicality, and adequacy.[45]

The numerosity requirement mandates that the class be "so numerous that joinder of all members is impracticable."[46] Commonality requires a showing that common issues of fact or law affect all class members.[47] "Typicality 'requires that the claims of the class representatives be typical of those of the class, and is satisfied when each class member's claim arises from the same course of events [ ] and each class member makes similar legal arguments to prove the defendant's liability.' "[48] Adequacy demands that "the representative parties will fairly and adequately protect the interests of the class."[49]

Finally, the courts have added an "implied requirement of ascertainability" to the express requirements of Rule 23(a).[50] "[T]he requirement that there be a class will not be deemed satisfied unless the class description is sufficiently definite so that it is administra-

---

**39.** *See* Sarson Dep. at 274:12–275:6.

**40.** *See* Stipulation ¶ II.5. In repo financing, the borrower sells the collateral to the lender and at the same time agrees to buy it back later from the lender at a higher price. The difference in price between the original sale price and the later repurchase price is the interest on the loan. In the case of a default, the lenders are already the legal owners of the collateral and do not have to take further legal action to obtain it. *See* Rebuttal Declaration of James J. Angel, plaintiffs' expert, Ex. H to Meltzer Decl. ("Angel Decl.") ¶ 17 n. 6.

**41.** *See* Defendant's Amended Responses and Objections to Plaintiffs' Second Set of Interrogatories, Ex. C to LeVan Decl., at No. 7; *see also* 2/11/09 Internal GMAM Email, Ex. G to Bonderoff Deck, at 6 (noting that GMAM had discussed whether to hold or sell the 2009 Sigma MTNs with JPMC in September 2008, which had recommended that GMAM hold the MTNs because GMAM "would maximize our principal return by holding the positions" and that the information provided by JPMC about the underlying assets "gave a general indication that it was a fairly high quality portfolio", but "[i]f the repo financing hadn't fallen apart so dramatically at the end of last year, we think we probably would have been paid. *Who knew?*") (emphasis added).

**42.** *See* AFTRA Compl. ¶ 84; ICERS Compl. ¶ 82; MaBSTOA Compl. ¶ 87.

**43.** *See* AFTRA Compl. ¶ 13; ICERS Compl. ¶ 13; MaBSTOA Compl. ¶ 17.

**44.** *Marisol A. v. Giuliani*, 126 F.3d 372, 378 (2d Cir.1997) (quoting *Sharif ex rel. Salahuddin v. New York State Educ. Dep't*, 127 F.R.D. 84, 87 (S.D.N.Y.1989)).

**45.** *See Teamsters Local 445 Freight Div. Pension Fund v. Bombardier Inc.*, 546 F.3d 196, 201–02 (2d Cir.2008).

**46.** Fed.R.Civ.P. 23(a)(1).

**47.** *See* Fed.R.Civ.P. 23(a)(2).

**48.** *Central States*, 504 F.3d at 245 (quoting *Robinson v. Metro-N. Commuter R.R. Co.*, 267 F.3d 147, 155 (2d Cir.2001)).

**49.** Fed.R.Civ.P. 23(a)(4).

**50.** *In re IPO Sec. Litig.*, 471 F.3d 24, 30 (2d Cir.2006).

tively feasible for the court to determine whether a particular individual is a member." [51] " 'An identifiable class exists if its members can be ascertained by reference to objective criteria.' " [52]

### 2. Rule 23(b)

In addition to showing that the proposed class satisfies the four prerequisites of Rule 23(a), plaintiffs must show that the class is "maintainable" under Rule 23(b). A class satisfies this requirement if it fits into one of the three alternative categories delineated by Rule 23(b), subdivisions (1), (2), and (3). In the case at bar, plaintiffs move for class certification pursuant to subdivision (b)(3).

Under Rule 23(b)(3), certification is appropriate where "questions of law or fact common to the members of the class predominate over any questions affecting only individual members," and the court finds that class litigation "is superior to other available methods for the fair and efficient adjudication of the controversy." [53] Generally, " '[t]he predominance requirement is met if the plaintiff can establish that the issues in the class action that are subject to generalized proof, and thus applicable to the class as a whole, ... predominate over those issues that are subject only to individualized proof.' " [54] The Second Circuit has observed that this subdivision

> encompasses those cases in which a class action would achieve economies of time, effort, and expense, and promote uniformity of decision as to persons similarly situated, without sacrificing procedural fair-

ness or bringing about other undesirable results. [55]

That some class members may be subject to a unique defense that is inapplicable to other class members does not undermine a conclusion that common issues predominate.

> [A]lthough "a defense may arise and may affect different class members differently, [this occurrence] does not compel a finding that individual issues predominate over common ones." So "long as a sufficient constellation of common issues binds class members together, variations in the sources and application of a defense will not automatically foreclose class certification." [56]

"Therefore, the question for purposes of determining predominance is not whether a defense exists, but whether the common issues will predominate over the individual questions raised by that defense." [57]

Under Rule 23(b)(3), a court must also determine whether a class action is "superior to other available methods for fairly and efficiently adjudicating the controversy." [58] In determining whether the class action mechanism is the most "fair and efficient" method of resolving a case, courts must consider the following four nonexclusive factors: "(1) the interest of the class members in maintaining separate actions; (2) 'the extent and nature of any litigation concerning the controversy already commenced by or against members of the class'; (3) 'the desirability or undesirability of concentrating the litigation of the claims in the particular forum'; and (4) 'the difficulties likely to be

---

**51.** 7A Wright, Miller, & Kane, *supra*, § 1760. *See also In re Fosamax Prods. Liab. Litig.*, 248 F.R.D. 389, 395 (S.D.N.Y.2008) (quoting *Rios v. Marshall*, 100 F.R.D. 395, 403 (S.D.N.Y.1983)).

**52.** *In re Fosamax*, 248 F.R.D. at 395 (quoting *In re Methyl Tertiary Butyl Ether ("MTBE") Prods. Liab. Litig.*, 209 F.R.D. 323, 337 (S.D.N.Y.2002)).

**53.** Fed.R.Civ.P. 23(b)(3).

**54.** *Brown v. Kelly*, 609 F.3d 467, 482–83 (2d Cir.2010) (quoting *Cordes & Co. Fin. Servs., Inc. v. A.G. Edwards & Sons, Inc.*, 502 F.3d 91, 107–08 (2d Cir.2007)) (alteration and ellipsis in original). *Accord In re Nassau County Strip Search Cases*, 461 F.3d 219, 225 (2d Cir.2006) ("[P]redo-

minance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation.") (quotation marks omitted).

**55.** *Brown*, 609 F.3d at 482–83 (quotations marks omitted).

**56.** *In re Nassau County*, 461 F.3d at 225 (2d Cir.2006) (quoting *In re Visa Check/MasterMoney Antitrust Litig.*, 280 F.3d 124, 138 (2d Cir.2001), *abrogated on other grounds by In re IPO*, 471 F.3d 24) (quotation marks and alteration omitted).

**57.** *In re Visa Check*, 280 F.3d at 138.

**58.** Fed.R.Civ.P. 23(b)(3).

encountered in the management of a class action.'"[59]

### 3. Rule 23(g)

"[A] court that certifies a class must appoint class counsel."[60] In doing so, a court must consider the following: (1) "the work counsel has done in identifying or investigating potential claims in the action;" (2) "counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action;" (3) "counsel's knowledge of the applicable law;" and (4) "the resources that counsel will commit to representing the class."[61] "The court may also consider any other matter pertinent to counsel's ability to fairly and adequately represent the interests of the class."[62]

### 4. Standard of Review

■ Plaintiffs bear the burden of demonstrating—by a preponderance of the evidence—that the proposed class meets the requirements for class certification.[63] This Court must "'assess all of the relevant evidence admitted at the class certification stage' when determining whether to grant a Rule 23 motion."[64] "[T]he obligation to make such determinations is not lessened by overlap between a Rule 23 requirement and a merits issue, even a merits issue that is identical with a Rule 23 requirement."[65] However, "in making such determinations, a district judge should not assess any aspect of the merits unrelated to a Rule 23 requirement."[66]

### B. ERISA and Common Law Breach of Fiduciary Duty

The elements of a claim for breach of fiduciary duty under ERISA are "(1) that defendant was a fiduciary who, (2) was acting within his capacity as a fiduciary, and (3) breached his fiduciary duty."[67] The elements of a claim for breach of fiduciary duty under New York law are "breach by a fiduciary of a duty owed to plaintiff; defendant's knowing participation in the breach; and damages."[68]

■ A fiduciary is any individual or entity that "'exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets,' or 'has any discretionary authority or discretionary responsibility in the administration of such plan.'"[69] Where an investment account held with a broker is nondiscretionary—that is, the alleged fiduciary lacks investment discretion—no fiduciary relationship exists.[70]

ERISA, codifying the common law "prudent man rule,"[71] provides that a fiduciary is required to "discharge his duties with respect to a plan solely in the interest of the

---

**59.** *In re Nassau County,* 461 F.3d at 230 (quoting Fed.R.Civ.P. 23(b)(3)).

**60.** Fed.R.Civ.P. 23(g)(1).

**61.** Fed.R.Civ.P. 23(g)(1)(A).

**62.** Fed.R.Civ.P. 23(g)(1)(B).

**63.** *See Teamsters,* 546 F.3d at 202.

**64.** *Id.* (quoting *In re IPO,* 471 F.3d at 42).

**65.** *In re IPO,* 471 F.3d at 41. *Accord In re Flag Telecom Holdings, Ltd. Sec. Litig.,* 574 F.3d 29, 34–35 (2d Cir.2009).

**66.** *In re IPO,* 471 F.3d at 41.

**67.** *In re Morgan Stanley ERISA Litig.,* 696 F.Supp.2d 345, 353 (S.D.N.Y.2009).

**68.** *SCS Commc'ns, Inc. v. Herrick Co.,* 360 F.3d 329, 342 (2d Cir.2004) (citing *Diduck v. Kaszycki*

*& Sons Contractors, Inc.,* 974 F.2d 270, 281–82 (2d Cir.1992)).

**69.** *Id.* at 354 (quoting 29 U.S.C. § 1002(21)(A)). *Accord Flickinger v. Harold C. Brown & Co.,* 947 F.2d 595, 599 (2d Cir.1991) (explaining that a fiduciary relationship exists under New York law "when one person is under a duty to act for or to give advice for the benefit of another upon matters within the scope of the relation.") (quotation marks and alteration omitted).

**70.** *See Independent Order of Foresters v. Donald, Lufkin & Jenrette, Inc.,* 157 F.3d 933, 940 (2d Cir.1998) ("Under New York law, as generally, there is no general fiduciary duty inherent in an ordinary broker/customer relationship. Such a duty can arise only where the customer has delegated discretionary trading authority to the broker.") (citation omitted).

**71.** *Morrissey v. Curran,* 567 F.2d 546, 548 & n. 8 (2d Cir.1977).

participants and beneficiaries and for the exclusive purpose of: providing benefits to participants and their beneficiaries; and defraying reasonable expenses of administering the plan." [72] This should be done "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man" would use. [73] These obligations have been referred to as " 'the highest known to the law.' " [74] A fiduciary that breaches these obligations "shall be personally liable to make good to such plan any losses to the plan resulting from each such breach ... and shall be subject to such other equitable or remedial relief as the court may deem appropriate ...." [75]

## IV. DISCUSSION

JPMC does not dispute that plaintiffs have demonstrated numerosity, commonality, typicality or adequacy. [76] I have carefully reviewed plaintiffs' submissions and find that plaintiffs have met each of these requirements by a preponderance of the evidence. [77] I am also convinced that the class is ascertainable using objective criteria [78] and that Barroway Topaz satisfies the requirements of Rule 23(g). [79]

The analysis with regard to predominance and superiority is more complex. JPMC does not dispute that common questions predominate with regard to *all* plaintiffs'—including the direct account holders'—conflict of interest and breach of contract claims. [80] JPMC also does not dispute that the prudence claims of the seventy-one class members who were members of JPMC's collective investment vehicles throughout the class period should be afforded class treatment. [81] Moreover, JPMC concedes superiority for those claims and class members. [82] Indeed, I find that plaintiffs have demonstrated that common questions predominate over individual issues in connection with those claims and class members [83] and that those claims can be resolved efficiently in a single proceeding. Thus, the only real dispute is whether plaintiffs can demonstrate predominance and superiority insofar as the class seeks to include the prudence claims of the direct account holders—NYSCRF, IBM, GMAM, NYMEX, and World Bank.

### A. Rule 23(b) Predominance

■ According to JPMC, adjudicating plaintiffs' prudence claims on a class-wide

---

**72.** 29 U.S.C. § 1104(a)(1)(A). *Accord Matter of Estate of Schulman,* 165 A.D.2d 499, 568 N.Y.S.2d 660, 663 (3d Dep't 1991) (noting that under New York law, a fiduciary must comply with the "prudent man rule"); *see also Katsaros v. Cody,* 744 F.2d 270, 279 (2d Cir.1984).

**73.** 29 U.S.C. § 1104(a)(1)(B).

**74.** *LaScala v. Scrufari,* 479 F.3d 213, 219 (2d Cir.2007) (quoting *Donovan v. Bierwirth,* 680 F.2d 263, 272 n. 8 (2d Cir.1982)).

**75.** 29 U.S.C. § 1109(a).

**76.** *See* Def. Opp. at 7 n. 2.

**77.** *See* List of Sigma Holders, Ex. A to Stipulation (demonstrating that the class includes seventy-six geographically-dispersed class members, each of which has thousands of plan beneficiaries); AFTRA Compl. ¶ 90 (listing five common questions of law and fact); ICERS Compl. ¶ 88 (same); MaBSTOA Compl. ¶ 93 (same); Pl. Mem. at 26–31 (explaining for establishing typicality and adequacy that the claims of the proposed class representatives arise from the same events and course of misconduct as the claims of other class members and are based on the same legal theory, there are no conflicts of interest between the proposed class representatives and

other putative class members, and no unique defenses apply only to proposed class representatives); Declaration of Denny Delk, member of the Board of Trustees of the AFTRA Retirement Fund (explaining that AFTRA is ready, willing, and able to serve the class as its representative); Declaration of Julie Villeneuve, Trustee of ICERS (same); Declaration of Kevin McKenna, chairman of the Investment Commit tee of MaBSTOA Pension Plan (same).

**78.** *See* List of Sigma Holders (demonstrating that putative class members can be readily identified).

**79.** *See* Firm Resume of Barroway Topaz, Ex. F to LeVan Decl.

**80.** *See* Def. Opp. at 7 n. 2.

**81.** *Id.*

**82.** *Id.*

**83.** *See* Pl. Mem. at 33–36 (identifying thirteen common questions of law and fact that predominate in this action as well as identifying common evidence that will be offered to prove JPMC's liability).

basis will require the fact finder to determine both whether the decision to invest in and hold the 2009 Sigma MTNs was prudent and whether it was JPMC or the client that was responsible for making the decision.[84] JPMC contends that the answers to these questions require an account-by-account analysis. JPMC further argues that assessing damages on a class-wide basis creates an irreconcilable conflict between direct account holders and the rest of the class. I now address each of these arguments.

### 1. Predominance of Common Questions Regarding the Decision to Purchase and Hold the 2009 Sigma MTNs

Plaintiffs' prudence claim is overwhelmingly dominated by a number of common issues of law and fact. They include whether: (1) JPMC owed a fiduciary duty of prudence to all of the class members; (2) JPMC knew or should have known that its investment in the 2009 Sigma MTNs was imprudent; (3) JPMC violated its fiduciary duty of prudence by investing in, and holding, the 2009 Sigma MTNs on behalf of all of the class members; (4) JPMC knew of, or with reasonable diligence could have discovered, Sigma's precarious financial position at the time it invested in, and continued to hold, the 2009 Sigma MTNs; and (5) class members sustained losses as a result of JPMC's alleged breach of its fiduciary duty of prudence.

In addition to the existence of these common and predominant issues, plaintiffs have demonstrated that their proof on these questions will focus on class-wide common evidence. For example, the investment guidelines and risk-return profiles of both the collective investment vehicles and direct account holders were "very, very conservative in nature." [85] As explained by JPMC portfolio manager David Reddy, all accounts were subject to "standard guidelines." [86] These standard guidelines created investment mandates similar to those for 2a–7 money market funds.[87] 2a–7 money market funds are widely regarded in the financial industry as one of the most conservative, liquid, and safe investments available.[88] Pursuant to these guidelines and profiles, JPMC was to invest in conservative, high-quality, low-risk assets.[89] Plaintiffs claim, however, that the 2009 Sigma MTNs were an imprudent investment in light of the market conditions that existed at the time-evidence of which will also be common to all class members.[90]

With regard to the decision to purchase the 2009 Sigma MTNs, the evidence shows JPMC conducted the due diligence on Sigma on behalf of *all* class members—members in collective investment vehicles and direct account holders.[91] While those efforts did not analyze the appropriateness of the 2009 Sigma MTNs for a particular client or portfolio, they resulted in JPMC's decision to purchase the 2009 Sigma MTNs for securities lending participants generally—*i.e.*, because they were sufficiently conservative.[92]

Once the due diligence was complete, the portfolio managers agreed among themselves to purchase a block of five hundred million dollars worth of 2009 Sigma MTNs.[93] They

---

84. *See* Def. Opp. at 25.

85. Reddy Dep. at 29:16–30:3. *Accord* Sarson Dep. at 174:3–10 (stating that maintaining the accounts in the securities lending program focuses on preserving the account's capital); Nigro Decl. ¶¶ 15, 16 (explaining that the conservative mandate of the guidelines and portfolios is also evidenced by their requisite high credit ratings and short length of investments, both of which are designed to mitigate the risk of default and price volatility); Koehn Dep. at 75:12–24 (acknowledging that the guidelines of all class members shared the same goal of investing in "high-quality fixed-income securities that return principal and a little bit of interest").

86. Reddy Dep. at 26:10–30:3.

87. *See id.* at 29:16–30:3.

88. *See* Nigro Decl. ¶ 15.

89. *See* Reddy Dep. at 29:16–30:3; Koehn Dep. at 75:12–24; Nigro Decl. ¶ 9.

90. *See* Nigro Decl. ¶ 21 (listing nineteen "red flag events impacting the residential mortgage market, and financial markets generally, prior to June 4, 2007").

91. *See* Stipulation ¶ II.3.

92. *See id.* ¶ II.4.

93. *See* Sarson Dep. at 260:20–23, 261:19–262:8; Brinton Dep. at 24:2–16; Reddy Dep. at 15:6–21.

determined how to allocate the MTNs across the direct accounts and collective investment vehicles.[94] Although each portfolio manager was to make the allocation decision based on his or her account's guidelines and portfolio composition, no investor in a collective investment vehicle nor any direct account holder "directed specific purchases of a specific security." [95] Thus, JPMC treated the direct account holders in the same way as the rest of the proposed class at the time of purchase.

After the purchase was made, JPMC continued to conduct due diligence on Sigma and the Sigma MTNs "on behalf of the Sigma Holders as a whole ...." [96] JPMAM was responsible for monitoring the issuer's ongoing creditworthiness and the securities lending portfolio managers relied on JPMAM for all post-purchase due diligence.[97] JPMAM was also responsible for making recommendations to hold or sell a specific investment.[98] Those recommendations were made without regard to any particular securities lending participant's account details, investment guidelines, or portfolio characteristics.[99] JPMAM's recommendations were then forwarded to direct account holders or the portfolio managers of the collective investment funds who, using that information, would decide whether to hold or sell the investment.[100]

JPMC—through JPMAM—uniformly recommended to direct account holders and portfolio managers that they should hold the 2009 Sigma MTNs.[101] The same questions that underlie JPMC's decision to hold the 2009 Sigma MTNs on behalf of the collective investment vehicles underlie JPMAM's rec-

ommendation to direct account holders. Thus, the overwhelmingly dominant question is whether the 2009 Sigma MTNs were a prudent investment and the evidence offered to prove or disprove plaintiffs' prudence claims is common to all class members.

JPMC disputes this conclusion and urges this Court to focus on the minutiae of the direct account holders' investment guidelines, risk-return portfolios, and the control each could have exerted over their accounts. JPMC first argues that the direct account holders' investment guidelines and risk-return portfolios were materially different from those of the collective investment vehicles— making the question of whether the 2009 Sigma MTNs investment was prudent an individualized inquiry.[102] For example, GMAM's investment guidelines permitted a maximum concentration of five percent for a single issuer while CashCo permitted a maximum concentration of ten percent.[103] GMAM was also more restrictive in requirements for long-term investment quality than several other funds.[104] Furthermore, some direct account holders' guidelines permitted investments only with pre-approved issuers, while the CashCo guidelines, for example, did not require such pre-approval.[105]

JPMC also contends that differences existed with regard to risk-return profiles. For instance, between 2005 and 2008, CashCo and NYSCRF differed in the concentration of their portfolios among corporate, money market, bank, repo and U.S. Treasury securi-

---

**94.** *See* Sarson Dep. at 260:20–23, 261:19–262:8; Brinton Dep. at 24:2–16; Reddy Dep. at 15:6–21.

**95.** Sarson Dep. at 42:10–17.

**96.** Stipulation ¶ II.4.

**97.** *See* Sarson Dep. at 170:2–10; Reddy Dep. at 56:19–57:19.

**98.** *See* Reddy Dep. at 73:2–75:24, 89:12–91:25.

**99.** *See id.; see also id.* at 121:25–122:6.

**100.** *See id.; see also id.* at 121:25–122:6.

**101.** *See* 8/4/08 JPMAM Fixed Income Research–Sigma Finance Corporation, Ex. G to Bonderoff Decl., at 5; Reddy Dep. at 121:25–122:6.

**102.** *See* Def. Opp. at 24–29; 7/8/08 JPMC Sur–Reply Letter ("Def.SurReply") at 3; Koehn Decl. ¶ 31 (opining that the investment guidelines and portfolios of the direct account holders are different from those of the rest of the class "with respect to permissible investments, concentration, maturity, and quality guidelines"); Key Characteristics Table.

**103.** *See* Koehn Decl. ¶ 32.

**104.** *See id.*

**105.** *See id.*

ties.[106] NYSCRF had a consistently higher percentage of assets in corporate securities and a consistently lower percentage in bank securities. "[E]ach portfolio was therefore exposed to different industry-specific risks." [107]

Moreover, the composition of asset ratings at the time of purchase varied between Cash-Co and NYSCRF. "For example, during the first half of 2007, the assets purchased by NYSCRF were mainly rated AAA or were very short-term unrated securities, while the ratings of the assets bought by CashCo were spread across different rating categories." [108] JPMC argues that to determine whether the 2009 Sigma MTNs were a prudent investment for the direct account holders, the fact finder must consider the guidelines and portfolio of each, thereby creating individualized questions that will predominate over all common issues.

I disagree. While JPMC has identified some differences among the guidelines and risk-return profiles, these differences are "extremely minor" and "[n]one of them differentially affect the imprudence of the Sigma investment." [109] The guidelines and risk-return profiles of both the collective investment vehicles and the direct accounts

> explicitly permit most of the common safe short-term money market instruments such as commercial paper, Treasury bills, repurchase agreements, floating rate notes, and corporate notes. They all have concentration guidelines. They all have maturity guidelines that keep the maturity fairly short. They all require the highest credit rating for short-term investments and that long-term paper be rated some-

where in the A category or higher. None of them permit investment in common stock, preferred stock, junk bonds, hedge funds, real estate, or collectibles.[110]

Plaintiffs' position is not that the Sigma MTNs could have been appropriate investments for some securities lending participants, but not others. Rather, plaintiffs argue that the Sigma MTNs were too risky an investment for *any* securities lending participant by virtue of the basic, low-risk, high-quality structure that a securities lending program entailed. That there were slight variations in guidelines and portfolios is irrelevant to the common thread that links the prudence claims of the direct account holders to those that invested in the collective investment vehicles—that, according to plaintiffs, the Sigma MTNs were not a conservative, high-quality, low-risk investment.

JPMC also argues that variations in direct account holders' control over their accounts as well as their communications with JPMC present highly individualized questions.[111] For example, NYSCRF granted its portfolio manager authority to purchase securities issued by Sigma specifically,[112] but the portfolio manager had the discretion to determine exactly which Sigma securities were purchased without prior approval.[113] Similarly, IBM set parameters for investments made on its behalf, but did not direct its portfolio manager to invest in 2009 Sigma MTNs or expressly consent to the purchase.[114] By contrast, none of the investors in the collective investment vehicles provided pre-approved lists of issuers and portfolio managers neither needed, nor obtained, the consent or

---

**106.** *See id.* ¶ 44; Table: Fund Investment Composition (CashCo Fund versus New York State Common Retirement Fund), Ex. 5 to Koehn Decl.

**107.** Koehn Decl. ¶ 44.

**108.** *Id.* ¶ 48. *Accord id.* ¶¶ 48–49 (opining that "these differences reflect the different risk-return profiles of the CashCo and NYSCRF portfolios" and such "differences directly bear on a decision to hold or sell the Sigma notes"); Table: Percentage of Floating Rate Assets (Measure of Interest Rate Risk), Ex. 6 to Koehn Decl.; Table: Fund Composition by Asset Rating at Purchase

(CashCo Fund versus NYSCRF), Ex. 8 to Koehn Decl.

**109.** Angel Decl. ¶ 30.

**110.** *Id.*

**111.** *See* Def. Opp. at 24–29; *see also* Def. Sur–Reply at 1–2.

**112.** *See* Sarson Dep. at 265:10–13.

**113.** *See id.* at 41:4–11.

**114.** *See id.* at 264:6–23.

approval of the client in order to purchase the 2009 Sigma MTNs.[115]

JPMC also contends that control over the decision to *hold* the 2009 Sigma MTNs varied among the accounts.[116] In April 2008, following a Moody's downgrade of Sigma's long term rating from AAA to A2, JPMC alerted NYSCRF and IBM to the downgrade.[117] JPMC advised NYSCRF and IBM that it would continue to hold the 2009 Sigma MTNs in their accounts unless JPMC was instructed to sell them.[118] NYSCRF did not instruct JPMC to sell the 2009 Sigma MTNs.[119] NYSCRF documents dated August 2008 indicate that NYSCRF may have relied, at least in part, on JPMC's recommendation to hold the 2009 Sigma MTNs until maturity.[120]

After posing a series of questions regarding its Sigma investment, IBM asked for guidance from its portfolio manager as to how to proceed and received the same recommendation to hold the 2009 Sigma MTNs to maturity.[121] IBM also received advice from a third party—not JPMC—regarding its Sigma investment.[122] Ultimately, IBM instructed JPMC to sell all securities issued by SIVs except for those specified on an attached list.[123] That list included Sigma and thus indicated that IBM wished to hold its 2009 Sigma MTNs.[124] After similar communications, GMAM, NYMEX and World Bank—direct account holders at the time or soon thereafter—continued to hold their 2009 Sigma MTNs.[125] Of course these clients likely considered, at least in part, JPMAM's recommendations. JPMC argues that, based on this evidence, the analysis of investor preferences for collective investment vehicle participants is fundamentally different from the analysis for direct account holders.[126]

JPMC exaggerates these differences and their importance. For purposes of determining liability, it is JPMC's conduct—rather than that of individual class members—that is the key issue.[127] JPMAM made the deci-

---

115. *See id.* at 263:20–264:5; Reddy Dep. at 63:25–64:5.

116. *See* Koehn Decl. ¶¶ 35–40.

117. *See* Sarson Decl. ¶¶ 17, 20.

118. *See id.*

119. *See* Brinton Dep. at 48:6–17; Sarson Dep. at 292:12–298:25.

120. *See* 8/11/08 Internal NYSCRF Email, Ex. G to Bonderoff Decl., at 4–6 ("Based upon the financial information we have on Sigma to date and the current prospects for a full payout, I recommend (as does JPM) continuing to hold the 2009's until maturity.").

121. *See id.; see also* 5/23/08 Internal JPMC Email, Ex. E to Bonderoff Deck, at 4–5 (expressing concern that "IBM may possibly instruct us to liquidate Sigma *in spite of the fact that we have recommended a hold* based on the information available from the analyst"); 6/6/08 Email from IBM to JPMC, Ex. G to Bonderoff Deck, at 6–7 (expressing frustration that JPMC had not answered IBM's questions satisfactorily or provided recommendations).

122. *See* 5/15/08 Internal IBM Email, Ex. J to Bonderoff Decl., at 1.

123. *See* Deposition of Nicole Devine, JPMC portfolio manager (submitted electronically to the Court after the motion was fully briefed, but not filed) ("Devine Dep.") at 112:12–20; IBM Amended and Restated Investment Management Agreement, Ex. I to Bonderoff Deck ("IBM Amended Agreement"), at 1–6.

124. *See* Devine Dep. at 112:12–20; IBM Amended Agreement at 6.

125. *See* Sarson Decl. ¶¶ 24, 25 & n. 3; 4/7/08 Letter from JPMC to GMAM, Ex. D to Bonderoff Decl. at 15; 2/11/09 Internal GMAM Email, Ex. G to Bonderoff Decl., at 6–7 (explaining that although GMAM questioned JPMC's initial decision to invest in 2009 Sigma MTNs on their behalf, GMAM "discuss[ed] Sigma with JPM on several occasions" and "ma[d]e a choice" to hold the Sigma notes rather than "lock in losses immediately by trying to sell in a credit impaired market", but noting that it made this decision in part because "JPM thought that we would maximize our principal return by holding the positions ... [a]nd what information JPM did provide about the underlying assets gave a general indication that [Sigma] was a fairly high quality portfolio").

126. *See* Def. Opp. at 24–29; Koehn Decl. ¶ 40.

127. *See Stanford v. Foamex, L.P.*, 263 F.R.D. 156, 165 (E.D.Pa.2009) (" '[T]he appropriate focus in a breach of fiduciary duty claim is the conduct of the defendants, not the plaintiffs.' ") (quoting *In re IKON Office Solutions, Inc.*, 191 F.R.D. 457, 465 (E.D.Pa.2000)); *In re Merck & Co. Sec., Deriv. & ERISA Litig.*, No. 05 Civ. 1151, 2009 WL 331426, at *8 (D.N.J. Feb. 10, 2009) (finding that "determination of whether Defendants breached a fiduciary duty of prudence to the Plans will not

sion that the 2009 Sigma MTNs were an appropriate investment for its securities lending participants. It was based on that recommendation that JPMC's portfolio managers purchased the 2009 Sigma MTNs. That two out of the seventy-six class members had the authority to dictate which issuers JPMC could purchase from for their accounts has little bearing on the question on whether the purchase of the 2009 Sigma MTNs was prudent.

Similarly, JPMAM made the recommendation to hold the 2009 Sigma MTNs—a recommendation that both the portfolio managers of the collective investment vehicles and the direct account holders followed. The direct account holders' ability to direct JPMC to sell the 2009 Sigma MTNs does not detract from the overarching question of whether JPMAM's recommendation to hold the notes was prudent. Accordingly, these differences

do not create individual issues that threaten to predominate over those that are common to the entire class.[128]

Even if the differences outlined above were as substantial as JPMC suggests, JPMC has, at best, identified defenses that are unique to five out of seventy-six class members—approximately 6.6 percent. The existence of these defenses are insufficient to find that individual issues predominate.[129]

### 2. Conflict of Interest

■ JPMC also contests predominance on the grounds that there may be conflicts among the purported class members with regard to the calculation of damages.[130] Some of the direct account holders held significant quantities of Sigma notes during the relevant period other than the June 2009 MTNs at issue here.[131] According to JPMC,

turn on the details of individual plaintiffs' subjective opinions"); *see also In re Polaroid ERISA Litig.*, 240 F.R.D. 65, 76 (S.D.N.Y.2006) (relying on similar statements to find the typicality element was satisfied).

**128.** JPMC's citations to *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997), *McLaughlin v. American Tobacco Co.*, 522 F.3d 215 (2d Cir.2008), and *Moore v. PaineWebber, Inc.*, 306 F.3d 1247, 1253 (2d Cir.2002), are also inapplicable. *See* Def. Opp. at 28–29. Unlike those cases, plaintiffs' claims are brought under only ERISA and New York law, concern a common set of operative facts, and, at most, involve individual questions limited to a subset of five class members on one claim and on limited issues. There is no threat of a series of mini-trials. *Cf. Amchem*, 521 U.S. at 597, 624, 626, 117 S.Ct. 2231 (denying class certification in a case involving thousands, if not millions, of individuals exposed to asbestos and dozens of differing state laws where individualized issues included whether each individual suffered from one of numerous asbestos-related diseases, type of asbestos exposed to, length of exposure, manner of exposure, and individual smoking/medical history, each of which were considered significant in nature); *McLaughlin*, 522 F.3d at 223 (holding that where reliance in a civil RICO claim could not be proven with common, class-wide evidence, a class numbering into the thousands could not be certified); *Moore*, 306 F.3d at 1253 (same).

**129.** *See In re Nassau County*, 461 F.3d at 229–30 ("The only countervailing, individualized liability issue was whether, regardless of the policy, some plaintiffs were strip searched based upon 'reasonable and contemporaneously held suspicion.' The existence of this defense does not foreclose

class certification. . . . [A]ny such reasonable suspicion inquiries will be de minimis; indeed, defendants set forth that such an inquiry will only be sought regarding a limited number of plaintiffs."); *see also Smilow v. Southwestern Bell Mobile Sys., Inc.*, 323 F.3d 32, 39–40 (1st Cir. 2003) ("[W]here common issues otherwise predominated, courts have usually certified Rule 23(b)(3) classes even though individual issues were present in one or more affirmative defenses. After all, Rule 23(b)(3) requires merely that common issues predominate, not that all issues be common to the class."); *Waste Mgmt. Holdings, Inc. v. Mowbray*, 208 F.3d 288, 296 (1st Cir.2000) (holding that although the existence of an affirmative statute of limitations defense should be considered in assessing class certification, "the mere fact that such concerns may arise and may affect different class members differently does not compel a finding that individual issues predominate over common ones. As long as a sufficient constellation of common issues binds class members together, variations in the sources and application of statutes of limitations will not automatically foreclose class certification under Rule 23(b)(3)."); *In re WorldCom, Inc. Sec. Litig.*, 219 F.R.D. 267, 303–04 (S.D.N.Y. 2003) (same); *Caleb & Co. v. E.I. DuPont de Nemours & Co.*, 110 F.R.D. 316, 321 (S.D.N.Y. 1986) ("The fact that the defendants may be able to assert affirmative defenses against some shareholders . . . should not defeat this motion for class certification.").

**130.** *See* Def. Opp. at 30–31.

**131.** *See* Koehn Decl. ¶¶ 52–59 (outlining the "likely conflicts of interest with respect to *damages*") (emphasis added); Table: All Sigma Me-

these different Sigma securities holdings give rise to different litigation interests because the different direct account holders will have an incentive to argue for different dates on which they alleged JPMC should have sold their 2009 Sigma MTNs.[132] JPMC urges this Court to hold that these conflicting litigation interests preclude certification of a class including direct account holders.[133]

JPMC's argument relies on the faulty premise that plaintiffs allege that JPMC was imprudent in buying and holding *all* Sigma MTNs. However, plaintiffs allege only that JPMC's was imprudent in buying and holding the 2009 Sigma MTNs; plaintiffs take no position on whether it was prudent for JPMC to hold any other Sigma MTNs.[134] Each specific maturity of Sigma MTNs is a unique security with its own maturity date, pricing and CUSIP. Plaintiffs provide the following example:

> On December 17, 2007, an analyst estimated that Sigma would face a "liquidity squeeze" due to its obligations to repay $22.5 billion in MTNs by the end of September 2008. Given the news (and prior news of the liquidity crisis beginning in early 2007), it would have been imprudent to hold Sigma MTNs maturing after September 2008 (including the Sigma MTNs at issue here) but the conclusion may not be the same for Sigma MTNs scheduled to mature prior to that date.[135]

Moreover, Reddy and another JPMC portfolio manager, Adam Brinton, testified that a Sigma MTN with one maturity date can be sold without having to sell any other maturities.[136] Accordingly, the date on which JPMC allegedly should have sold the 2009 Sigma MTNs has little bearing on when and if JPMC should have sold any other Sigma notes.

Finally, JPMC's intraclass conflict argument centers on the issues of calculating damages. Even if JPMC's position had merit—which it does not—individualized issues relating to damages are insufficient to defeat class certification where other common issues predominate.[137] Such a conclusion is particularly true here where any individualized damages questions would be limited solely to the prudence claims of only five class members.[138]

## B. Rule 23(b) Superiority

 I also find that plaintiffs have met their burden to establish superiority by a preponderance of the evidence. Here, the class consists of seventy-six entities, with thousands of beneficiaries, whose claims can be resolved efficiently in a single proceeding. JPMC concedes superiority for the majority of the proposed class, but argues that a class action is not a superior method of adjudicating the prudence claims of the five direct account holders.[139] JPMC contends that the direct account holders are sophisticated institutional investors that each held millions of dollars of the Sigma securities at issue and

dium–Term Notes Maturing after August 2007 and Held by Potential Class Members, Ex. 1 to Koehn Decl. ("Sigma MTN Holdings Table").

**132.** *See* Def. Opp. at 30–31.

**133.** *See id.*

**134.** *See* Pl. Reply at 18.

**135.** *Id.* at 19 (citing AFTRA Compl. ¶ 51).

**136.** *See* Reddy Dep. at 105:8–106:7.

**137.** *See In re NYSE Specialists Sec. Litig.*, 260 F.R.D. 55, 74 (S.D.N.Y.2009) ("Conflicts over damages, at this early stage in the litigation, need not defeat a motion for certification.") (citing *In re WorldCom, Inc. Sec. Litig.*, 219 F.R.D. 267, 302 (S.D.N.Y.2003) ("When liability can be determined on a class-wide basis, individualized damage issues are not ordinarily a bar to class certification.")).

**138.** If further discovery and proceedings in this action reveal that, indeed, the interests of direct account holders and the rest of the class diverge on the question of damages, I am confident that there are sufficient case management tools to ensure that all members of the class are protected. These tools include, but are not limited to, the authority to alter or amend the class certification order pursuant to Rule 23(c)(1)(c), to certify subclasses pursuant to Rule 23(c)(5), and the authority to issue orders ensuring "the fair and efficient conduct of the action" under Rule 23(d). Advisory Commit tee Note on Subdivision (d). *See also In re Flag Telecom*, 574 F.3d at 37; *Marisol A.*, 126 F.3d at 379.

**139.** *See* Def. Opp. at 31–35.

have ample resources and incentive to pursue individual claims.[140]

"[T]he existence of large individual claims that are sufficient for individual suits is no bar to a class when the advantages of unitary adjudication exist to determine the defendant's liability."[141] For example, in *In re NASDAQ Market–Makers Antitrust Litigation*—a case cited by JPMC—the court rejected defendants' argument that the institutional investors should be excluded from the proposed class because their trades were significantly different from those executed by other investors.[142] The court held that the large institutional investors should be included in the class upon finding that (1) multiple lawsuits would be costly and inefficient; (2) class certification would partially equalize the bargaining power between plaintiffs and defendants, and thus improve the chances of an equitable settlement; (3) although larger institutional investors may be capable of filing individual suits, smaller institutional investors may not be willing and able to hire counsel to "battle against the collective resources of the nation's largest financial industry firms"; and (4) including the institutional investors—who executed nearly seventy percent of all trades—would significantly improve the prospects for an overall resolution.[143] The court's rationale rings true here as well. Moreover, this case has the added consideration that the direct account holders have a strong disincentive to "initiate individual lawsuits because they may not be willing to sue their securities custodian with whom they have active ongoing relationships."[144] I therefore conclude

that plaintiffs have met their burden of demonstrating superiority for all of their claims.

## V. CONCLUSION

For the foregoing reasons, plaintiffs' motion for class certification is granted. AFTRA, ICERS, and MaBSTOA are appointed class representatives and Barroway Topaz is appointed class counsel. The Clerk of the Court is directed to close this motion (Document No. 46 in 09 Civ.686). A conference is scheduled for August 17, 2010 at 3:00 p.m. in Courtroom 15C.

SO ORDERED:

---

**140.** *See id.* at 33. JPMC also contends that the superiority element cannot be met with regard to the direct account holders because their claims require an individualized inquiry and their inclusion in the class creates serious manageability problems because the "critical issues going to plaintiffs' claims cannot be decided by class-wide proof applicable to direct account holders." *Id.* at 31–35. Because I have already found that these individualized issues do not threaten to overwhelm the class and class-wide proof can be used on behalf of *all* class members, I need not address JPMC's arguments here.

**141.** 2 Newberg on Class Actions, § 4.29 at 260 (4th ed.2010). *Accord Amchem,* 521 U.S. at 617,

117 S.Ct. 2231 (Rule 23 "does not exclude from certification cases in which individual damages run high.") (quotation marks omitted).

**142.** *See* 172 F.R.D. 119, 124 (S.D.N.Y.1997).

**143.** *Id.* at 129–30.

**144.** Pl. Reply at 23. *Cf. In re Cardizem CD Antitrust Litig.,* 200 F.R.D. 297, 325 (E.D.Mich. 2001) (finding a class action superior where "[t]he companies involved may reasonably believe that given the size of the losses involved, even treble damages are not sufficient to outweigh the cost in good will of suing their suppliers") (quotation marks omitted).